RENNER, J.
*631 Plaintiff Antoinette Rossetta appeals from a judgment dismissing her second amended complaint[1] after the trial court sustained a demurrer by defendants CitiMortgage, Inc. (CitiMortgage) and U.S. Bank National Association as Trustee for Citicorp Residential Trust Series 2006-1 (2006-1 Trust). The complaint asserts causes of action for intentional misrepresentation, negligent misrepresentation, breach of contract, promissory estoppel, negligence, intentional infliction of emotional distress, and unlawful business practices in violation of the Unfair Competition Law arising from loan modification negotiations spanning more than two years. Rossetta also appeals from the trial court's dismissal of a cause of action for conversion that appeared in an earlier iteration of the complaint to which CitiMortgage and the 2006-1 Trust (collectively, CitiMortgage, unless otherwise indicated) also successfully demurred.
We conclude (1) the trial court erred in sustaining the demurrer to the causes of action for negligence and violations of the Unfair Competition Law, (2) the trial court properly sustained the demurrer to the causes of action for intentional misrepresentation and promissory estoppel, but should have granted leave to amend to give Rossetta an opportunity to state a viable cause of action based on an alleged oral promise to provide her with a Trial Period Plan (TPP) under the Home Affordable Mortgage Program (HAMP) in April 2012, and (3) the trial court properly sustained the demurrer to the causes of action for negligent misrepresentation, breach of contract, intentional infliction of emotional distress and conversion without leave to amend. Accordingly, we affirm in part and reverse in part.
*632 I. BACKGROUND
A. The Loan and Deed of Trust
Rossetta purchased a home in Grass Valley in 2001. She refinanced the purchase through American Brokers Conduit (ABC) in 2005.[2] The new loan was secured by a deed of trust designating Mortgage Electronic Registration Systems, Inc. (MERS) as the beneficiary acting as the nominee for ABC and ABC's successors and assigns.[3] The loan was subsequently *601 sold to CitiMortgage.[4]
Although CitiMortgage started accepting Rossetta's mortgage payments in March 2006, MERS did not record an assignment of deed of trust until October 12, 2012. As we shall discuss, Rossetta challenges the assignment of the deed of trust.
B. Rossetta Defaults
Rossetta was laid off from her job on or about March 1, 2010. Approximately two weeks later, she learned she had a recurrence of breast cancer. Rossetta made complete payments on her mortgage during this difficult period using severance pay from her former job. In May 2010, Rossetta contacted CitiMortgage to discuss other options. According to the complaint, Rossetta "was told that [CitiMortgage] would be unable to assist her unless she was at least three months delinquent in her monthly mortgage payments, and thus in default."
Rossetta went into default in June 2010. Around the same time, she executed a power of attorney authorizing her fiancé, Brian Roat, to act on her behalf.
C. Rossetta Attempts to Secure a Loan Modification
Rossetta or Roat telephoned CitiMortgage in July 2010. Either Rosetta or Roat spoke with a CitiMortgage representative named Brian (last name *633 unknown) or Charlie Welch. The representative told Rossetta or Roat that "nothing could be done to assist [Rossetta] with a HAMP loan modification until she was three months delinquent and therefore in [d]efault."[5] On July 23, 2010, Rossetta received a letter from CitiMortgage stating she was not eligible for a HAMP modification because " 'default is not imminent.' " By then, however, Rossetta was already in default, and had even received correspondence to this effect from CitiMortgage.
Roat telephoned CitiMortgage again on August 1, 2010. A customer service representative collected basic information from Roat and informed him that Rossetta may now qualify for a HAMP modification. The following day, Rossetta received an electronic communication from CitiMortgage regarding a permanent loan modification. The complaint describes the communication as an email, and attaches a copy as Exhibit B.
The complaint alleges: "[Rossetta] has attached as Exhibit 'B' an email from [CitiMortgage] stating the specific terms of the permanent loan modification agreement." Elsewhere, the complaint alleges: "[O]n August 2, 2014 [,] [CitiMortgage] emailed [Rossetta that] the terms of the permanent loan modification were as follows: (1) 480 month term; (2) .02% interest rate; (3) a principal reduction in the amount of $95,477.81. (See Exhibit 'B'). The email also stated that the loan modification documents were being sent to [Rossetta]." As *602 we shall discuss, Exhibit B does not support Rossetta's characterization.
On August 3, 2010, Rossetta spoke with Helen, a CitiMortgage representative who declined to give her last name. The complaint is ambiguous as to what, precisely, Helen said. At one point, the complaint suggests that Helen told Rossetta "she was approved for a trial plan modification and a permanent loan modification upon successful completion of the trial plan payments." Later, the complaint suggests that Helen told Rossetta she "would be approved for a permanent loan medication [sic ] upon completion of the trial modification plan payments/repayment plan payments." Later still, the complaint suggests that Helen told Rossetta "she was approved for a HAMP loan modification."
On August 9, 2010, CitiMortgage sent Rossetta a letter stating, in part: "Your request for a repayment plan has been approved." The letter attaches an agreement contemplating three monthly payments of $1,209 for September, October and November 2010. Rossetta agreed to the terms of the repayment plan on August 15, 2010. Neither the letter nor accompanying agreement makes any mention of HAMP or any other loan modification *634 program. Nevertheless, the complaint alleges that Rossetta believed she would receive a permanent loan modification upon completion of the repayment plan.
Rossetta made the three monthly payments contemplated by the repayment plan. She did not receive a permanent loan modification. When Rossetta approached CitiMortgage, she was told to continue making monthly payments of $1,209.
On January 3, 2011, Rossetta received a letter from CitiMortgage stating that her application for a HAMP modification had been denied for failure to provide necessary documentation. Rossetta alleges she provided all requested documents. She also alleges that CitiMortgage lost or mishandled her loan modification application, causing significant delays and increasing fees and penalties.
Around this time, Roat spoke with an unidentified CitiMortgage representative and learned that Rossetta's application was denied because she failed to produce a statement from the State of California declaring her permanently disabled. Rossetta contends the State of California does not issue such a statement, adding that "[CitiMortgage] requested a nonexistent document to further delay the process and frustrate [Rossetta]."
Rossetta entered into forbearance agreements with CitiMortgage in January and February 2011. She applied for another HAMP modification in July 2011. Rossetta alleges that CitiMortgage requested the same documents over and over again, confirming her suspicion that application materials had been misplaced or mishandled. Among other things, Rossetta notes that CitiMortgage demanded she produce her entire loan application on two separate occasions, requesting duplicates of other previously submitted documents by fax. Rossetta alleges she promptly responded to all such requests. She further alleges that CitiMortgage lost or mishandled her documents, delaying the loan modification process and causing her harm.
Rossetta's personal circumstances changed during the pendency of the application. Specifically, she stopped receiving disability insurance and began receiving unemployment insurance. As a result, CitiMortgage demanded that Rossetta submit a new application and supporting documents. Rossetta complied and submitted the requested documents on October 12, 2011.
*603 On November 1, 2011, Rossetta returned to work at a reduced salary. Once again, the change in circumstances prompted a demand for additional documents. Once again, Rossetta complied.
On January 18, 2012, Rossetta received a letter stating that her application for a HAMP modification had been denied. This time, Rossetta was told that *635 she had an excessive forbearance amount ($33,000) on her account. Rossetta alleges the forbearance amount would have been significantly less had she been given a permanent loan modification "over a year earlier as had been represented."
Rossetta continued to seek mortgage relief. On April 6, 2012, Roat spoke with CitiMortgage representative Konnor Sincox. According to the complaint, Sincox told Roat that Rossetta "was approved for another trial loan modification and that upon completion, [she] would receive a permanent loan modification with a 2% fixed interest rate for five years and a principal reduction." Elsewhere, the complaint alleges that Sincox represented that Rossetta "had been approved for another trial loan modification and that she would receive it as soon as the loan modification application and required documents were received from [her]." Although Sincox did not specifically say so, Rossetta believed she would be receiving a trial period plan under HAMP (HAMP TPP), as she had previously been under consideration for a HAMP modification. According to the complaint, "Sincox indicated that the loan modification documentation would not be provided in advance, but rather, would come after the trial payment period."
Following Roat's conversation with Sincox, Rossetta once again sent the requested documents. Despite Roat's conversation with Sincox, CitiMortgage never sent Rossetta a HAMP TPP or permanent loan modification agreement. According to the complaint, Rossetta and Roat continued their effort to obtain a permanent loan modification for the rest of the year, without success. Rossetta filed for bankruptcy protection in December 2012.
D. Assignment of Deed of Trust
On October 12, 2012, MERS assigned its interest in the deed of trust to CitiMortgage. Approximately one year later, Rossetta commissioned a "forensic audit" of the loan. According to the complaint, "[t]he audit revealed that the Assignment of Deed of Trust to [d]efendant [CitiMortgage] was invalid as void because the [2006-1 Trust] had a closing date of August 30, 2006." Although the first amended complaint and second amended complaint identify the 2006-1 Trust as a "purported beneficiary of the [s]ubject [l]oan," neither pleading alleges that CitiMortgage or any other entity ever attempted to assign the loan to the 2006-1 Trust.
CitiMortgage assigned the deed of trust to U.S. Bank National Association, as Trustee for Prof-2013-M4 REMIC Trust I (M4 REMIC Trust 1) on April 1, 2012. Rossetta challenges the assignment from CitiMortgage to the M4 REMIC Trust 1 on the sole ground that the earlier assignment from MERS to CitiMortgage was void.
*636 E. The Instant Action
Rossetta commenced this action against CitiMortgage and its successor in interest, Fay Servicing, LLC (Fay) on January 27, 2014.[6] Rossetta filed a first amended complaint on April 24, 2014. The first amended complaint asserted causes of action for intentional misrepresentation, *604 negligent misrepresentation, breach of contract, promissory estoppel, negligence, intentional infliction of emotional distress, conversion, violations of the Unfair Competition Law and conspiracy. The first amended complaint also sought declaratory relief.[7] CitiMortgage demurred.
The trial court sustained the demurrer without leave to amend as to the cause of action for conversion and request for declaratory relief, both of which were based on the allegation that the assignment of the deed of trust to CitiMortgage was void. The trial court sustained the demurrer to Rossetta's remaining causes of action with leave to amend, observing:
"[T]he tenor of the demurrer is not so much what the pleading says, as what it does not. Plaintiff's counsel, who successfully prevailed in Bushell v. JPMorgan Chase Bank, N.A. (2013) 220 Cal.App.4th 915, 163 Cal.Rptr.3d 539 [ ( Bushell ) ], cited by them in their opposition, is certainly conversant about the requirements of pleading a similar case such as this one. Notwithstanding, the allegations here fail to properly differentiate between and/or connect the trial payment plans and forbearance agreements alleged with HAMP modification, rendering analysis incomplete because the parties and court cannot determine if, for example, the Bushell / West [v. JPMorgan Chase Bank, N.A. (2013) 214 Cal.App.4th 780, 154 Cal.Rptr.3d 285 ( West ) ] line of cases applies (HAMP cases) or whether the analysis must be done without reference to HAMP under traditional common law principles. As argued by the defendants, forbearance plans do not create a binding contract for modification. Of course, this Court cannot determine whether such obscurity is intentional or inadvertent. However, in permitting amendment, the Court can state its expectation that plaintiff clearly set forth the context of each representation and agreement in any further pleading, or risk suffering the conclusion that further amendment would be pointless." (Italics added.)
Rossetta filed the operative complaint on August 11, 2014. As noted, the complaint asserts causes of action for intentional misrepresentation, negligent misrepresentation, breach of contract, promissory estoppel, negligence, intentional infliction of emotional distress, violations of the Unfair Competition Law, *637 and conspiracy. CitiMortgage demurred to the complaint on September 15, 2014. The trial court sustained the demurrer without leave to amend. This appeal followed.
II. DISCUSSION
A.-E.**
F. Negligence
Next, the complaint alleges CitiMortgage negligently mishandled Rossetta's loan modification applications. The elements of a cause of action for negligence are (1) the existence of a duty to exercise due care, (2) breach of that duty, (3) causation, and (4) damages. (See Merrill v. Navegar, Inc. (2001) 26 Cal.4th 465, 500, 110 Cal.Rptr.2d 370, 28 P.3d 116.) Whether a duty of care exists is a question of law to be decided on a case-by-case basis. ( Lueras, supra, 221 Cal.App.4th at p. 62, 163 Cal.Rptr.3d 804.)
*605 As a "general rule," lenders do not owe borrowers a duty of care unless their involvement in a transaction goes beyond their "conventional role as a mere lender of money." ( Nymark v. Heart Fed. Savings & Loan Assn. (1991) 231 Cal.App.3d 1089, 1096, 283 Cal.Rptr. 53 ( Nymark ).) "Even when the lender is acting as a conventional lender," however, "the no-duty rule is only a general rule." ( Jolley, supra, 213 Cal.App.4th at p. 901, 153 Cal.Rptr.3d 546.) Thus, " ' Nymark does not support the sweeping conclusion that a lender never owes a duty of care to a borrower.' " ( Ibid. )
In order to determine whether a duty of care exists, courts balance the Biakanja[16] factors, "among which are [ (1) ] the extent to which the transaction was intended to affect the plaintiff, [ (2) ] the foreseeability of harm to him, [ (3) ] the degree of certainty that the plaintiff suffered injury, [ (4) ] the closeness of the connection between the defendant's conduct and the injury suffered, [ (5) ] the moral blame attached to the defendant's conduct, and [ (6) ] the policy of preventing future harm." ( Nymark, supra, 231 Cal.App.3d at p. 1098, 283 Cal.Rptr. 53, citing Biakanja, supra, 49 Cal.2d at p. 650, 320 P.2d 16.)
California courts of appeal have not settled on a uniform application of the Biakanja factors in cases that involve a loan modification. Although *638 lenders have no duty to offer or approve a loan modification ( Lueras, supra, 221 Cal.App.4th at p. 68, 163 Cal.Rptr.3d 804 ; Jolley, supra, 213 Cal.App.4th at p. 903, 153 Cal.Rptr.3d 546 ), courts are divided on the question of whether accepting documents for a loan modification is within the scope of a lender's conventional role as a mere lender of money, or whether, and under what circumstances, it can give rise to a duty of care with respect to the processing of the loan modification application. (Compare Lueras, supra, 221 Cal.App.4th at p. 67, 163 Cal.Rptr.3d 804 [residential loan modification is a traditional lending activity, which does not give rise to a duty of care] with Alvarez v. BAC Home Loans Servicing, L.P. (2014) 228 Cal.App.4th 941, 948, 176 Cal.Rptr.3d 304 ( Alvarez ) [servicer has no general duty to offer a loan modification, but a duty may arise when the servicer agrees to consider the borrower's loan modification application], Daniels, supra, 246 Cal.App.4th at pp. 1180-1183, 201 Cal.Rptr.3d 390 [following Alvarez and applying Biajanka factors to conclude that lender owed borrowers a duty of care in the loan modification process] and Jolley, supra, at p. 906, 153 Cal.Rptr.3d 546 [commercial lending creates a special relationship, thereby creating a duty of care].) Federal district courts in California have also reached different results. (Compare, e.g., Marques v. Wells Fargo Bank, N.A. (N.D. Cal. Oct. 13, 2016, No. 16-cv-03973-YGR), 2016 U.S. Dist. LEXIS 142193 *19 [servicers do not owe borrowers a duty of care in processing loan modification applications], Garcia v. PNC Mortgage (N.D. Cal. Sept. 16, 2015, No. 14-cv-3543-PJH), 2015 U.S. Dist. LEXIS 123920 *9 ["a servicer, as any financial institution, owes no duty of care to a borrower in the provision of ordinary financial services such as loan modifications"], Hernandez v. Select Portfolio, Inc. (C.D. Cal. June 25, 2015, No. CV 15-01896 MMM (AJWx)) 2015 U.S. Dist. LEXIS 82922, *56 ["a lender that agrees to consider a borrower's loan modification application does not act outside its conventional role as a money lender and does not owe a duty of care"] ) with *606 Segura v. Wells Fargo Bank, N.A. (C.D. Cal. Sept. 26, 2014, No. CV-14-04195-MWF (AJWx)) 2014 U.S. Dist. LEXIS 143038, *32-33[a duty of care exists once the lender offers a borrower the opportunity to apply for a loan modification], Penermon v. Wells Fargo Home Mortgage (N.D. Cal. Aug. 28, 2014, No. 14-cv-00065-KAW), 47 F.Supp.3d 982, 2014 U.S. Dist. LEXIS 121207 *13-14 ["once [defendant] provided Plaintiff with the loan modification application and asked her to submit supporting documentation, it owed her a duty to process the completed application once it was submitted"), and Johnson v. PNC Mortgage (N.D. Cal. 2015) 80 F.Supp.3d 980, 985-986 ["Once PNC offered the Johnsons an opportunity to modify their loan, it owed them a duty to handle their application with ordinary care"].) Although the Ninth Circuit has signaled that it may view the "no duty" line of cases as more persuasive (see, e.g., Anderson v. Deutsche Bank Nat'l Trust Co. Ams. (9th Cir. 2016) 649 Fed.Appx. 550, 552 [loan servicer has no common law duty to approve application within a particular *639 time frame] ), the federal appellate court has declined to certify the question to our Supreme Court, which has yet to speak to the issue. ( Id. at p. 552, fn. 1.)
The trial court relied on Lueras to hold that "lenders do not have a common law duty of care ... to offer, consider, or approve a loan modification, to offer foreclosure alternatives, or to handle loans so as to prevent foreclosure." In Lueras, the plaintiff borrower alleged the defendant lender breached its duty of care by " 'failing to timely and accurately respond to customer requests and inquiries,' by 'failing to comply with state consumer protection laws, properly service the loan, and use consistent methods to determine modification approvals,' " among other things. ( Lueras, supra, 221 Cal.App.4th at p. 63, 163 Cal.Rptr.3d 804.) The Court of Appeal for the Fourth District, Division Three, concluded that lenders do not owe a duty of care in considering or approving loan modification applications, reasoning that "a loan modification is the renegotiation of loan terms, which falls squarely within the scope of a lending institution's conventional role as a lender of money." ( Id. at p. 67, 163 Cal.Rptr.3d 804.)
Applying the Biakanja factors, the court explained: "If the modification was necessary due to the borrower's inability to repay the loan, the borrower's harm, suffered from denial of a loan modification, would not be closely connected to the lender's conduct. If the lender did not place the borrower in a position creating a need for a loan modification, then no moral blame would be attached to the lender's conduct." ( Lueras, supra, 221 Cal.App.4th at p. 67, 163 Cal.Rptr.3d 804.) Accordingly, the court concluded the Biakanja factors weighed against the imposition of a common law duty of care. ( Ibid. ) However, the court recognized that "a lender does owe a duty to a borrower to not make material misrepresentations about the status of an application for a loan modification or about the date, time, or status of a foreclosure sale." ( Id. at p. 68, 163 Cal.Rptr.3d 804.)
Rossetta contends the trial court erred in relying on Lueras , claiming that Alvarez is the better reasoned decision. In Alvarez , the plaintiffs alleged the lender breached its duty of care by failing to review their loan modification applications in a timely manner, foreclosing on their properties while they were under consideration for a HAMP modification, misplacing their applications, and mishandling them by relying on incorrect salary information. ( Alvarez, supra, 228 Cal.App.4th at p. 945, 176 Cal.Rptr.3d 304.) The Court of Appeal for the First District, Division Three, acknowledged the general rule, but observed that, " ' " Nymark and the cases cited therein do not purport to state a legal principle that a lender can never be held liable for negligence in its handling of a loan transaction *607 within its conventional role as a lender of money." ' " ( Id. at p. 946, 176 Cal.Rptr.3d 304, citing Jolley, supra, 213 Cal.App.4th at p. 902, 153 Cal.Rptr.3d 546.)
Applying the Biakanja factors, the court found: "The transaction was intended to affect the plaintiffs and it was entirely foreseeable that failing to *640 timely and carefully process the loan modification applications could result in significant harm to the applicants." ( Alvarez, supra, 228 Cal.App.4th at p. 948, 176 Cal.Rptr.3d 304.) With regard to the connection between the defendant's conduct and the injury suffered, the court found: " 'Although there was no guarantee the modification would be granted had the loan been properly processed, the mishandling of the documents deprived [the plaintiffs] of the possibility of obtaining the requested relief.' " ( Id. at p. 949, 176 Cal.Rptr.3d 304.) With respect to blameworthiness, the court found: "The borrower's lack of bargaining power, coupled with conflicts of interest that exist in the modern loan servicing industry, provide a moral imperative that those with the controlling hand be required to exercise reasonable care in their dealings with borrowers seeking a loan modification." ( Ibid. ) Finally, the court found that the policy of preventing future harm strongly favored the imposition of a duty of care after the California Homeowner Bill of Rights was effectuated on January 1, 2013. ( Id. at p. 950, 176 Cal.Rptr.3d 304.) Accordingly, the court concluded that when a lender agrees to consider a borrower's application for a loan modification, the Biakanja factors weigh in favor of imposing a duty of care. ( Id. at p. 948, 176 Cal.Rptr.3d 304.)
Pending guidance from our Supreme Court, we are persuaded by the reasoning in Alvarez . We find support for our conclusion in Meixner v. Wells Fargo Bank, N.A. (E.D. Cal. 2015) 101 F.Supp.3d 938, in which the federal district court, addressing the split in authority, observed: " Alvarez identified an important distinction not addressed by the Lueras reasoning-that the relationship differs between the lender and borrower at the time the borrower first obtained a loan versus the time the loan is modified. The parties are no longer in an arm's length transaction and thus should not be treated as such. While a loan modification is traditional lending, the parties are now in an established relationship. This relationship vastly differs from the one which exists when a borrower is seeking a loan from a lender because the borrower may seek a different lender if he does not like the terms of the loan." ( Id. at p. 954.)
Based on the foregoing, we are convinced that a borrower and lender enter into a new phase of their relationship when they voluntarily undertake to renegotiate a loan, one in which the lender usually has greater bargaining power and fewer incentives to exercise care. (See Alvarez , supra, 228 Cal.App.4th at p. 949, 176 Cal.Rptr.3d 304 [during loan modification negotiations, " 'borrowers are captive, with no choice of servicer, little information, and virtually no bargaining power ... [while] servicers may actually have positive incentives to misinform and under-inform borrowers' "].) We do not hold that a duty of care arises merely because a lender receives or considers a loan modification application. Nor do we hold, as the concurring opinion suggests, that a duty of care may arise solely by virtue of the parties' changing relationship. Rather, we conclude that the change in the parties' relationship can and should be factored into our application of the Biakanja factors. To this end, *641 we find it significant that CitiMortgage allegedly refused to consider Rossetta's loan modification application until she was three months behind in her *608 mortgage payments. By making default a condition of being considered for a loan modification, CitiMortgage did more than simply enhance its already overwhelming bargaining power; it arguably directed Rossetta's behavior in a way that potentially exceeds the role of a conventional lender. (See, e.g., Gerbery v. Wells Fargo Bank, N.A. (S.D. Cal. July 31, 2013, No. 13-CV-614-MMA (DHB)) 2013 U.S. Dist. LEXIS 107744, *32-33.) At a minimum, the alleged policy of making default a condition of being considered for a loan modification informs our application of the Biakanja factors (see Ko v. Bank of America, N.A. (C.D. Cal. Oct. 19, 2015, No. SACV 15-00770-CJC (DFMx)) 2015 U.S. Dist. LEXIS 142040, *28-99 (Ko )), to which we now turn.
With respect to the first factor, the loan modification transaction was plainly intended to affect Rossetta. CitiMortgage's decision on her application for a modification plan would likely determine whether or not Rossetta could keep her house. ( Alvarez, supra, 228 Cal.App.4th at p. 948, 176 Cal.Rptr.3d 304 ; Daniels, supra, 246 Cal.App.4th at p. 1182, 201 Cal.Rptr.3d 390.) We conclude the first Biakanja factor weighs in favor of finding a duty of care.
With respect to the second factor, the potential harm to Rossetta was readily foreseeable. " 'Although there was no guarantee the modification would be granted had the loan been properly processed, the mishandling of the documents deprived Plaintiff of the possibility of obtaining the requested relief.' " ( Alvarez, supra, 228 Cal.App.4th at p. 948, 176 Cal.Rptr.3d 304, citing Garcia v. Ocwen Loan Servicing, LLC (N.D. Cal. May 10, 2010, No. C 10-0290 PVT), 2010 U.S. Dist. LEXIS 45375 *9.) Furthermore, by making default a condition of being considered for a loan modification, CitiMortgage increased the likelihood that Rossetta would incur additional expenses of default during the lengthy loan modification process, thereby increasing the foreseeable potential harm. (Ko, supra, 2015 U.S. Dist. LEXIS 142040, *29-30 ["By creating an inducement for plaintiffs to default (and incur associated fees and interest payments) for there to be even a possibility of a modification, [the lender] has increased the foreseeability that a borrower would be harmed by the additional expenses of default incurred during a negligent implementation of the modification"].) We conclude the second Biakanja factor weighs in favor of finding a duty of care.
With respect to the third factor, Rossetta alleges she suffered injury in the form of damage to her credit, increased interest and arrears, and foregone opportunities to pursue unspecified other remedies. These allegations adequately establish injury at this stage of the proceedings. (See Daniels, supra, 246 Cal.App.4th at p. 1182, 201 Cal.Rptr.3d 390.) We conclude the third Biakanja factor weighs in favor of finding a duty of care.
*642 We have difficulty evaluating the fourth factor-the closeness of the connection between CitiMortgage's conduct and Rossetta's injuries-on the pleadings. On the one hand, the complaint alleges Rossetta's default was "imminent," suggesting she would have suffered damage to her credit and increased interest and arrears regardless of CitiMortgage's conduct. On the other hand, the complaint alleges Rossetta was current on her mortgage payments through May 2010, when she learned she could not be considered for a loan modification unless she defaulted. We do not know when Rossetta would have defaulted if left to her own devices, and "it is very likely that a borrower induced to default before it becomes absolutely necessary suffers associated injuries involving increased *609 fees and an increased possibility of losing the home." (Ko, supra, 2015 U.S. Dist. LEXIS 142040, *30.) Construing the complaint liberally, as we must, we conclude the fourth Biakanja factor weighs in favor of finding a duty of care.
With respect to the fifth factor, we agree with the Alvarez court's analysis. Although the court was unable to assess the lender's blameworthiness on the pleadings, the court nevertheless found it "highly relevant" that the borrowers' " 'ability to protect [their] own interests in the loan modification process [was] practically nil' " and the bank held " 'all the cards.' " ( Alvarez, supra, 228 Cal.App.4th at p. 949, 176 Cal.Rptr.3d 304.) There, as here, the borrowers were " 'captive, with no choice of servicer, little information, and virtually no bargaining power.' " ( Ibid. ) Following Alvarez , we conclude the borrower's lack of bargaining power, coupled with the lender's alleged incentive to unnecessarily prolong the loan modification process, "provide a moral imperative that those with the controlling hand be required to exercise reasonable care in their dealings with borrowers seeking a loan modification." ( Ibid. ) Additionally, we note that "the moral blame attached to the defendant's conduct ... is heightened when the defendant first induces a borrower to take a vulnerable position by defaulting and then subjects the borrower's loan application to a review process that does not meet the standard of ordinary care." (Ko, supra, 2015 U.S. Dist. LEXIS 142040, *30.) Accordingly, we conclude the fifth Biakanja factor weighs in favor of finding a duty of care.
Finally, with respect to the sixth factor, the legislature has enacted the California Homeowner Bill of Rights, which "demonstrates 'a rising trend to require lenders to deal reasonably with borrowers in default to try to effectuate a workable loan modification' " and " 'expressed a strong preference for fostering more cooperative relations between lenders and borrowers who are at risk of foreclosure, so that homes will not be lost.' " ( Alvarez, supra, 228 Cal.App.4th at p. 950, 176 Cal.Rptr.3d 304 ; see also Civ. Code, § 2923.6 [encouraging lenders to offer loan modifications to borrowers in appropriate circumstances].) Imposing a duty of care in the particular circumstances of this case would serve the policies underlying these legislative preferences, and prevent *643 future harm to borrowers, by giving lenders an incentive to handle loan modification applications in a timely and responsible manner. ( Alvarez, supra, at p. 950, 176 Cal.Rptr.3d 304.) We conclude the sixth Biakanja factor weighs in favor of finding a duty of care.
The complaint alleges CitiMortgage acted unreasonably by dragging Rossetta through a seemingly endless application process, requiring her to submit the same documents over and over again (including a "nonexistent" statement of permanent disability income), losing or mishandling documents, misstating the status of various applications, and ultimately denying them for bogus reasons. Having carefully weighed the Biajanka factors, we conclude these allegations adequately allege a cause of action for negligence that is sufficient to survive demurrer.
Relying on Civil Code section 2923.6, subdivision (g), CitiMortgage argues: "[CitiMortgage] was under no duty to review further loan modification application [sic ] from [Rossetta] after it denied [Rossetta] for a HAMP loan modification in writing in 2012, which [Rossetta] failed to appeal." We assume without deciding that Civil Code section 2923.6, subdivision (g), offers an affirmative defense to negligence *610 in loan modification cases.[17] Even so assuming, facts necessary to establish the affirmative defense do not appear in the complaint. CitiMortgage's contention that Rossetta failed to appeal from the denial of her loan modification applications suffers from the same defect. Whatever the merits of these arguments, they are inappropriate for resolution at the demurrer stage. ( Noguera v. North Monterey County Unified Sch. Dist. (1980) 106 Cal.App.3d 64, 66, 164 Cal.Rptr. 808 [matters outside the complaint will not be considered in evaluating a demurrer]; see also Matteson v. Wagoner (1905) 147 Cal. 739, 744, 82 P. 436 [where only part of the facts necessary to an affirmative defense appear in a complaint, the complaint is not rendered vulnerable to a general demurrer].) We therefore conclude the trial court erred in sustaining the demurrer to Rossetta's negligence cause of action.
G.-H.***
*644 I. Conversion
Finally, Rossetta contends the trial court erred in sustaining the demurrer to the cause of action for conversion in the first amended complaint.[22] Rossetta's conversion cause of action is based on the theory that the assignment of the deed of trust to CitiMortgage in October 2012 was invalid. The trial court correctly sustained the demurrer to Rossetta's conversion cause of action.
"An essential step in the process of securitizing a loan is the transfer of the promissory note and deed of trust into a trust." ( Mendoza v. JPMorgan Chase Bank, N.A. (2016) 6 Cal.App.5th 802, 806, 212 Cal.Rptr.3d 1.)[23] The complaint implies that Rossetta's loan, which closed in September 2005, was eligible for inclusion in the 2006-1 Trust, which closed on August 30, 2006. However, there is nothing in the record to suggest that CitiMortgage attempted or intended to securitize the loan. To the contrary, the judicially noticeable assignments reveal that MERS assigned the deed of trust to CitiMortgage on October 12, 2012, and CitiMortgage assigned the deed of trust to the M4 REMIC Trust 1 on April 1, 2014. The complaint does not allege-and nothing suggests-that CitiMortgage *611 attempted or intended to securitize the loan by transferring the promissory note and deed of trust to the 2006-1 Trust.
The parties devote considerable attention to the question, left open by our Supreme Court's recent opinion in Yvanova v. New Century Mortgage Co. (2016) 62 Cal.4th 919, 199 Cal.Rptr.3d 66, 365 P.3d 845, as to whether a borrower has standing to bring a preemptive action challenging the validity of a deed of trust assignment to a foreclosing party. ( Id. at pp. 924, 943, 199 Cal.Rptr.3d 66, 365 P.3d 845 [holding that a borrower has standing to challenge a nonjudicial foreclosure based on errors in the assignment by which the foreclosing party purportedly took a beneficial interest in the deed of trust, but leaving open the question whether a borrower has standing in the pre-foreclosure context]; and compare Saterbak v. JPMorgan Chase Bank, N.A., supra , 245 Cal.App.4th at p. 815, 199 Cal.Rptr.3d 790 [holding California law precludes borrowers from bringing preemptive actions to determine whether foreclosing parties have authority to foreclose *645 because such actions " 'would result in the impermissible interjection of the courts into a nonjudicial scheme [i.e. nonjudicial foreclosures] enacted by the California Legislature' "] with Lundy v. Selene Finance, LP (N.D. Cal. Mar. 17, 2016, No. 15-cv-05676-JST) 2016 U.S. Dist. LEXIS 35547 *39-40 [predicting that the California Supreme Court would likely limit a bar on pre-foreclosure suits only to "plaintiffs who lack any 'specific factual basis' for bringing their claims"].) We need not decide whether Rossetta has standing to challenge alleged deficiencies in the assignment of the deed of trust from MERS to the 2006-1 Trust because, on the face of the complaint, there was no such assignment. We therefore conclude the trial court properly sustained the demurrer to the cause of action for conversion without leave to amend.
III. DISPOSITION
The judgment of dismissal in favor of CitiMortgage is reversed. The order sustaining the demurrer is affirmed in part and reversed in part. The order is reversed as to the causes of action for negligence (fifth cause of action) and violations of the Unfair Competition Law (seventh cause of action). The trial court is directed to grant Rossetta leave to amend the causes of action for intentional misrepresentation (first cause of action) and promissory estoppel (fourth cause of action). In all other respects, the judgment is affirmed. The parties shall bear their own costs on appeal.
I concur:
MURRAY, J.

Unless otherwise indicated, all subsequent references to the "complaint," are to the second amended complaint filed on August 11, 2014.

ABC is not a party to this appeal.

" 'MERS is a private corporation that administers a national registry of real estate debt interest transactions. Members of the MERS System assign limited interests in the real property to MERS, which is listed as a grantee in the official records of local governments, but the members retain the promissory notes and mortgage servicing rights. The notes may thereafter be transferred among members without requiring recordation in the public records. [Citation.] [¶] Ordinarily, the owner of a promissory note secured by a deed of trust is designated as the beneficiary of the deed of trust. [Citation.] Under the MERS System, however, MERS is designated as the beneficiary in deeds of trust, acting as "nominee" for the lender, and granted the authority to exercise legal rights of the lender.' " (Saterbak v. JPMorgan Chase, N.A. (2016) 245 Cal.App.4th 808, 816, fn. 6, 199 Cal.Rptr.3d 790.)

The operative complaint alleges that CitiMortgage was "the servicer of the Subject Loan."

We describe the relevant features of HAMP below.

During the pendency of this appeal, the parties filed a stipulation and request for dismissal as to Fay and M4 REMIC Trust 1, which we have granted.

"Conspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration." (Applied Equipment Corp. v. Litton Saudi Arabia Ltd. (1994) 7 Cal.4th 503, 510-511, 28 Cal.Rptr.2d 475, 869 P.2d 454.)

See footnote *, ante .

Biakanja v. Irving (1958) 49 Cal.2d 647, 320 P.2d 16 (Biakanja )

Civil Code section 2923.6, subdivision (g), which has an effective date of January 1, 2013, provides: "In order to minimize the risk of borrowers submitting multiple applications for first lien loan modifications for the purpose of delay, the mortgage servicer shall not be obligated to evaluate applications from borrowers who have already been evaluated or afforded a fair opportunity to be evaluated for a first lien loan modification prior to January 1, 2013, or who have been evaluated or afforded a fair opportunity to be evaluated consistent with the requirements of this section, unless there has been a material change in the borrower's financial circumstances since the date of the borrower's previous application and that change is documented by the borrower and submitted to the mortgage servicer."

See footnote *, ante .

During oral argument, Rossetta's counsel informed the court that the claim for declaratory relief was "moot." Without deciding whether this claim is properly characterized as moot, we accept Rossetta's representation that the claim has been abandoned.

"Mortgage-backed securities are created through a complex process known as 'securitization.' (See Levitin & Twomey, Mortgage Servicing (2011) 28 Yale J. on Reg. 1, 13 ['a mortgage securitization transaction is extremely complex ...'].) In simplified terms, 'securitization' is the process where (1) many loans are bundled together and transferred to a passive entity, such as a trust, and (2) the trust holds the loans and issues investment securities that are repaid from the mortgage payments made on the loans. [Citation.] Hence, the securities issued by the trust are 'mortgage-backed.' " (Glaski v. Bank of America (2013) 218 Cal.App.4th 1079, 1082, fn. 1, 160 Cal.Rptr.3d 449.)