Filed 4/2/20

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| ROBERT WEIMER, JR., | C080550 |
| Plaintiff and Appellant, | (Super. Ct. No. SCV0035286) |
| v. | |
| NATIONSTAR MORTGAGE, LLC, et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Placer County, Michael W. Jones, Judge. Affirmed in part and reversed in part.

United Law Center, Danny A. Barak, Ronald W. Holland, Stephen J. Foondos and John S. Sargetis for Plaintiff and Appellant.

Severson & Werson, Jan T. Chilton, Elizabeth Holt Andrews and Elizabeth C. Farrell for Defendants and Respondents.

_____

[*] Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts II, III.A, C through D of the Discussion.

1

Plaintiff Robert Weimer, Jr., purchased real property in Carnelian Bay in 1993. He refinanced the mortgage in 2006 with a loan from defendant Bank of America, N.A. (BANA). After defaulting, plaintiff entered into a loan modification process with BANA. Subsequently, loan servicing was transferred, successively, to defendants Specialized Loan Servicing, LLC (SLS) and Nationstar Mortgage, LLC (Nationstar). According to plaintiff, BANA, SLS, and Nationstar successively each engaged in deliberate and negligent misconduct in the loan modification process. In 2014, BANA transferred beneficial interest in the loan to defendant U.S. Bank, N. A. (U.S. Bank), as trustee for the Certificateholders of Banc of America Funding Corporation Mortgage Pass Through Certificates Series 2007-7. Eventually, Nationstar, acting as U.S. Bank's agent, recorded a notice of trustee's sale and had an agent enter onto the property and change the locks.

After plaintiff commenced this action, BANA, U.S. Bank, and Nationstar demurred to a first amended complaint. The trial court sustained the demurrer without leave to amend as to BANA, concluding that the action against it was time-barred. As to the other demurring defendants, the court sustained the demurrer with leave to amend. Plaintiff filed a second amended complaint, asserting causes of action sounding in intentional and negligent misrepresentation, negligence, trespass to land, seeking declaratory relief, and asserting violations of the unfair competition law (Bus. & Prof. Code, § 17200 et seq.). U.S. Bank and Nationstar demurred, SLS separately demurred, and the trial court sustained the demurrers without leave to amend.

On appeal,[1] plaintiff asserts that the trial court erred in concluding that the action against BANA was time-barred because BANA's actions were part of a civil conspiracy

---

[1] Plaintiff separately appeals from two judgments. One judgment dismissed the action as asserted against SLS. The other judgment identified U.S. Bank, Nationstar, and, erroneously, BANA, as having successfully demurred to the second amended complaint,

2

with the other defendants, and the timeliness of plaintiff's action against BANA must be measured from the last overt act. Plaintiff further asserts that the trial court erred in sustaining the demurrers to the second amended complaint because he sufficiently stated each cause of action. Plaintiff also asserts that the trial court should have granted him leave to amend, however, he largely maintains that his complaint required no amendment.

In the unpublished portion of this opinion, we conclude that the action as asserted against BANA was time-barred. We further conclude that plaintiff sufficiently stated causes of action sounding in intentional and negligent misrepresentation and violations of the unfair competition law against the remaining defendants.

In the published portion of this opinion, based on the test in *Biakanja v. Irving* (1958) 49 Cal.2d 647 (*Biakanja*) and the analysis in *Southern California Gas Leak Cases* (2019) 7 Cal.5th 381, 397 (*Gas Leak*), we conclude the remaining defendants had a duty of care and that plaintiff sufficiently stated a cause of action for negligence against them.

---

and ordered "these Defendants . . . dismissed from this case with prejudice." A judgment of dismissal following BANA's successful demurrer to the first amended complaint does not appear in the record, and plaintiff has not appealed from any such judgment.

"An order sustaining a demurrer is usually not immediately appealable, because it is not on its face a final judgment. [Citation.] However, it may be treated as a judgment for purposes of appeal when, like a formal judgment, it disposes of the action and precludes further proceedings." (*Thaler v. Household Finance Corp.* (2000) 80 Cal.App.4th 1093, 1098.) "[A]n appellate court may deem an order sustaining a demurrer to incorporate a judgment of dismissal." (*Molien v. Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916, 920, disapproved on another ground in *Burgess v. Superior Court* (1992) 2 Cal.4th 1064, 1074.) Here, the order sustaining BANA's demurrer to the first amended complaint without leave to amend ended plaintiff's ability to proceed further in the trial court with his case against BANA. The only step left to make that order appealable as to BANA was the formal entry of a dismissal order or judgment. BANA has not sought dismissal of the appeal. We will deem the order on the demurrer to the first amended complaint to incorporate a judgment of dismissal as to BANA and will review the order. (See *Sisemore v. Master Financial, Inc.* (2007) 151 Cal.App.4th 1386, 1396.)

3

Therefore, we will reverse the judgments of dismissal as to U.S. Bank, SLS, and Nationstar and reverse the orders sustaining the demurrers as to the causes of action in the second amended complaint for intentional misrepresentation (first cause of action), negligent misrepresentation (second cause of action), negligence (third cause of action), and violations of the unfair competition law (sixth cause of action). In all other respects, the judgments are affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff purchased the subject property in Carnelian Bay in or about 1993 and alleges he "maintained it as one of his principal residences." He refinanced the mortgage on the property on or about May 25, 2006,[2] with a loan from BANA. Plaintiff alleged that, in or about January 2008, BANA froze plaintiff's bank accounts, and, as a result, he was not able to pay his mortgage payments for approximately three months. Additionally, BANA cancelled plaintiff's line of credit for unknown reasons, which negatively affected plaintiff's credit score. Plaintiff alleged that he never found out why BANA froze his accounts and cancelled his line of credit.

As a result of his delinquency, plaintiff entered into a loan modification process with BANA. In or about mid-2009, an agent, employee, or representative of BANA told plaintiff that he was approved for a loan modification that would reduce his monthly payments to $8,000 per month, reduce and fix his interest rate, and "reduce his principal" by $500,000. BANA required plaintiff to make a down payment of $50,000 to secure the loan modification, and, once it received that payment, it would halt the foreclosure sale.

---

[2] The complaint states that plaintiff refinanced with BANA in 2007. However, in his brief on appeal, plaintiff represents that this was error, and that he "would amend this allegation to include the correct year of 2006." Whether plaintiff refinanced with BANA in 2006 or 2007 is immaterial to this appeal.

Plaintiff asserted that his wife sent BANA a check for $50,000.[3]  However, the foreclosure sale was not postponed, and plaintiff "was forced to file a chapter 11 bankruptcy to stop the foreclosure sale."  BANA did not furnish the loan modification.

In or about early 2010, servicing of the loan was transferred from BANA to SLS. Plaintiff alleged that SLS notified him that it would take over for BANA in handling his loan modification application.[4]  From early 2010 through January 2014, plaintiff attempted to obtain a permanent loan modification from SLS.  However, during this time period, SLS "refused to honor the terms of the loan modification promised by" BANA, notwithstanding the one-time $50,000 payment.  Plaintiff repeatedly submitted identical and updated loan modification applications and documents to SLS.  Often, plaintiff was told that the documents were not received despite plaintiff having sent them directly to the addresses and individuals specified by SLS.  Plaintiff alleged that SLS mishandled or lost the applications and documents.  SLS continued to represent to plaintiff that he

---

[3]  Defendants filed a request that we take judicial notice of a memorandum of authorities filed in federal district court by plaintiff in an unrelated case which, according to defendants, would be relevant to prove that it was someone other than plaintiff's wife who tendered the $50,000 payment.  Ruling on the request was deferred pending calendaring and assignment of the panel.  We deny defendants' request for judicial notice on the ground that the identity of the individual who tendered the $50,000 payment on plaintiff's behalf is not relevant to the issues we must resolve on this appeal.  (See *Mangini v. R.J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1063 [matter to be judicially noticed must be relevant to a material issue].)

[4]  The complaint does not state whether SLS volunteered to plaintiff that it would take over the loan modification process or whether it so informed plaintiff in response to an inquiry by plaintiff.  The complaint alleges:  "In or about early 2010, the servicing rights of the Subject Loan were transferred from [BANA] to SLS.  SLS informed Plaintiff that they would take over for [BANA] in handling Plaintiffs' loan modification application. [¶]  As a result, Plaintiff renewed his attempts to obtain a loan modification from SLS." Reading the language of the complaint liberally (see *Longshore v. County of Ventura* (1979) 25 Cal.3d 14, 22 (*Longshore*)), we assume SLS voluntarily notified plaintiff that it would take over the modification process without an inquiry by plaintiff.

would be approved for a loan modification with terms similar to those previously offered by BANA. Meanwhile, "[a]s a result," plaintiff continued to accumulate arrears, penalties, and fees, and his credit continued to suffer. Additionally, plaintiff expended time, money, and effort in his attempts to obtain the loan modification.

On or about April 1, 2014, servicing of the loan was transferred from SLS to Nationstar. Nationstar informed plaintiff that, as a result of the transfer, he would have to begin the loan modification application process anew.[5] Nationstar refused to honor BANA's "previous representation of a permanent loan modification." Plaintiff once again had to submit the same applications and documents on multiple occasions, and was told to send them to locations in Arizona, Texas, and California. A named employee or agent of Nationstar told plaintiff that he was being evaluated for a Home Affordable Modification Program (HAMP) loan modification, sent him the application, and told him to complete it and submit it along with supporting documents.[6] Thus, according to the complaint, Nationstar "represented and led Plaintiff to believe that he was eligible to apply for and receive a HAMP loan modification." However, plaintiff could not qualify

---

[5] Similar to SLS, the complaint does not specify whether plaintiff was informed by Nationstar that it would take over the modification process because he inquired or whether SLS or Nationstar so informed plaintiff without an inquiry by plaintiff. The complaint alleges: "On or about April 1, 2014, the servicing rights of the Subject Property were transferred to Nationstar. [¶] At the time the transfer [from SLS to Nationstar] occurred Plaintiff was in the middle of applying for a loan modification with SLS. Nationstar informed Plaintiff that as a result of the transfer he would have to start the loan modification process over again." (Capitalization omitted.)

[6] " '[T]he United States Department of the Treasury implemented the Home Affordable [Modification] Program (HAMP) to help homeowners avoid foreclosure during the housing market crisis of 2008. "The goal of HAMP is to provide relief to borrowers who have defaulted on their mortgage payments or who are likely to default by reducing mortgage payments to sustainable levels, without discharging any of the underlying debt." ' " (*Lueras v. BAC Home Loans Servicing, LP* (2013) 221 Cal.App.4th 49, 56, fn. 1 (*Lueras*).)

6

for a HAMP loan modification because his loan, at $2,000,000, was well above the applicable maximum of $729,750.  Plaintiff alleged that Nationstar was aware of this.  According to plaintiff, Nationstar had him apply for a HAMP loan modification "so Plaintiff would maintain his delinquency and Nationstar would retain its status as a 'special servicer' for servicing a delinquent account and would enable it to collect additional fees for servicing a delinquent loan." (Capitalization omitted.)  In the alternative, plaintiff asserted that Nationstar acted unreasonably in evaluating him for a loan modification for which he was not qualified.  Plaintiff asserted that, like the servicers before it, Nationstar lost or misplaced plaintiff's applications and documents.

According to plaintiff, "[o]n or about, June 23, 2014, an Assignment of Deed of Trust was effectuated whereby [BANA] transferred its purported beneficial interest under the Deed of Trust to the U.S. Bank securitized trust."[7]

On or about August 15, 2014, Nationstar hired Cyprexx to enter the subject property and change the locks.  Plaintiff learned of this development after a notice was placed on his door.  Plaintiff contacted Cyprexx, and a named representative told him that Nationstar had hired Cyprexx to secure and winterize the premises.  Plaintiff alleged that Nationstar and Cyprexx knew plaintiff was still occupying the home.  Plaintiff reentered the property, installed new locks, and directed a caretaker to maintain the property while he was out of town on business.

Plaintiff alleged that defendants' actions constituted a continuing conspiracy to defraud and take advantage, and, therefore, the statute of limitations should be tolled until completion of the last overt act.  Plaintiff further alleged that it was defendants' plan to engage him in the loan modification process, with no intent to grant his loan modification applications, so that they could obtain additional compensation for servicing a delinquent

[7] Plaintiff asserted that this assignment and transfer was void ab initio, but has since abandoned that claim.

7

mortgage account and collect additional fees for every loan modification application he submitted.[8]

In a first amended complaint, plaintiff asserted eight causes of action against defendants: (1) intentional misrepresentation, (2) negligent misrepresentation, (3) promissory estoppel, (4) breach of contract, (5) negligence, (6) trespass to land, (7) declaratory relief, and (8) violation of Business and Professions Code section 17200.

Defendants Nationstar, BANA, and U.S. Bank demurred to the first amended complaint. Defendants asserted, among other things, that plaintiff's claims against BANA were all time-barred, and that, as to Nationstar and U.S. Bank, plaintiff failed to adequately state claims as to each cause of action. Defendants also requested that the trial court take judicial notice of certain documents and instruments, including several documents related to plaintiff's bankruptcy. Plaintiff filed his own request for judicial notice.

The trial court granted the requests for judicial notice. The trial court then sustained defendants' demurrer to the first amended complaint. The court stated that the "conclusory and overlapping allegations in the [first amended complaint] focus primarily upon the purported wrongful actions and conduct of defendant [BANA], which are followed by further conclusory allegations based primarily upon [BANA's] actions that plaintiff purports are attributable to defendants Nationstar and SLS. It is this deficient pleading that subjects plaintiff's [first amended complaint] to successful challenge by defendants in light of the prior bankruptcy. [Citations.] This same deficient pleading

---

[8] Thus, contrary to the contention of defendants' counsel at oral argument before this court, reading the language of the complaint liberally (see *Longshore, supra*, 25 Cal.3d at p. 22), it does allege that defendants sought to collect application fees for each loan modification application submitted, and it could be inferred that it collected such fees. Whether plaintiff could prove this allegation, or whether the collection of fees with each loan modification application is "prohibited by law" as asserted by defendants' attorney at oral argument, is immaterial here.

also subjects the [first amended complaint] to challenge based upon judicial estoppel. [Citation.] Even if the court were to accept the contentions made by plaintiff, which it does not, the eight causes of action are simply pled in too conclusory a manner to support the claims asserted against the moving defendants. Furthermore, the causes of action alleged against defendant [BANA] . . . are barred in light of the applicable statutes of limitations. It is for these reasons that the demurrer is sustained." The court sustained the demurrer with leave to amend as to defendants U.S. Bank and Nationstar, finding that, although the allegations were conclusory and failed to support plaintiff's claims, plaintiff presented a sufficient showing of his ability to cure the defects. However, having determined that the causes of action asserted against BANA were time-barred and plaintiff failed to show an ability to amend the complaint so as to cure this deficiency, the court sustained the demurrer without leave to amend as to BANA.

Plaintiff then filed a second amended complaint, asserting six causes of action as to U.S. Bank, SLS, and Nationstar: (1) intentional misrepresentation, (2) negligent misrepresentation, (3) negligence, (4) trespass to land, (5) declaratory relief, and (6) violation of Business and Professions Code section 17200. Plaintiff abandoned his promissory estoppel and breach of contract causes of action.

U.S. Bank and Nationstar demurred to the second amended complaint on the same grounds asserted in their first demurrer. Again, these defendants filed a request for judicial notice. The trial court granted the request for judicial notice and sustained the demurrer without leave to amend, concluding that plaintiff's allegations were insufficient to state causes of action. The trial court entered judgment in favor of BANA, U.S. Bank, and Nationstar, dismissing the action insofar as asserted against them. (See fn. 1, *ante*.)

SLS filed its own demurrer to the second amended complaint and a request for judicial notice. The trial court sustained the demurrer, dismissed the second amended complaint as asserted against SLS without leave to amend, and entered judgment.

9

## DISCUSSION

## I. Standard of Review

A demurrer tests the sufficiency of the complaint as a matter of law, and it raises only questions of law. (Code Civ. Proc., § 589, subd. (a).) "We review a trial court's decision to sustain a demurrer for an abuse of discretion." (*Zipperer v. County of Santa Clara* (2005) 133 Cal.App.4th 1014, 1019 (*Zipperer*).) " ' " 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed.' [Citation.] Further, we give the [complaint] a reasonable interpretation, reading it as a whole and its parts in their context." ' " (*Finch Aerospace Corp. v. City of San Diego* (2017) 8 Cal.App.5th 1248, 1251-1252.) "[T]he complaint must be liberally construed and survives a general demurrer insofar as it states, however inartfully, facts disclosing some right to relief." (*Longshore, supra*, 25 Cal.3d at p. 22; see also *Daniels v. Select Portfolio Servicing, Inc.* (2016) 246 Cal.App.4th 1150, 1162 (*Daniels*) [we decide "whether a cause of action has been stated under any legal theory when the allegations are liberally construed"].) "In reviewing an order sustaining a demurrer, we examine the operative complaint de novo to determine whether it alleges facts sufficient to state a cause of action under any legal theory. [Citation.] Where the demurrer was sustained without leave to amend, we consider whether the plaintiff could cure the defect by an amendment. The plaintiff bears the burden of proving an amendment could cure the defect." (*T.H. v. Novartis Pharmaceuticals Corp.* (2017) 4 Cal.5th 145, 162.)

## II. The Action Against BANA

### A. Statutes of Limitations and Commencement of this Action

"The statute of limitations to be applied in a particular case is determined by the nature of the right sued upon or the principal purpose of the action, not by the form of the action or the relief requested." (*Barton v. New United Motor Manufacturing, Inc.* (1996) 43 Cal.App.4th 1200, 1207 (*Barton*), citing *Davies v. Krasna* (1975) 14 Cal.3d 502, 515

10

& *Jefferson v. J.E. French Co.* (1960) 54 Cal.2d 717, 718.) "What is significant for statute of limitations purposes is the primary interest invaded by defendant's wrongful conduct." (*Barton,* at p. 1207.) BANA acknowledges that the applicable limitations periods here were up to four years.[9]

The claims plaintiff asserts against BANA, all arising out of the handling and processing of plaintiff's loan modification, were based on actions taken by BANA prior to "early 2010," when "servicing rights of the Subject Loan were transferred from [BANA] to SLS," at which time "SLS informed Plaintiff that they would take over for [BANA] in handling Plaintiff's loan modification application." Plaintiff commenced this action by filing the summons and complaint in October 2014. Thus, without resorting to a theory of civil conspiracy and the last overt act doctrine, plaintiff's action asserted against BANA would be time-barred based on a four-year limitations period, the longest of the applicable statutes of limitations.[10]

_____

[9] See Code of Civil Procedure section 337, subdivision (a), providing that the statute of limitations for an action on any contract founded on an instrument in writing is four years and Business and Professions Code section 17208, providing that the limitations period for unfair and unlawful business practices is four years. "The duration of the limitations period applicable to a declaratory relief action is determined by the nature of the underlying obligation sought to be adjudicated." (*Snyder v. California Ins. Guarantee Assn.* (2014) 229 Cal.App.4th 1196, 1208.) See also Code of Civil Procedure section 338, subdivision (d) (limitations period for cause of action sounding in intentional misrepresentation is three years); *Hydro-Mill Co., Inc. v. Hayward, Tilton & Rolapp Ins. Associates, Inc.* (2004) 115 Cal.App.4th 1145, 1155, citing Code of Civil Procedure section 339 (cause of action for negligent misrepresentation governed by two-year statute of limitations where allegations amount to a claim of professional negligence); *Newport Harbor Ventures, LLC v. Morris Cerullo World Evangelism* (2016) 6 Cal.App.5th 1207, 1224 and footnote 5, affirmed (2018) 4 Cal.5th 637, citing Code of Civil Procedure section 339, subdivision (1) (statute of limitations for promissory estoppel based on oral promises is two years); *Hydro-Mill,* at page 1154 (claim based on professional negligence governed by two-year statute of limitations set forth in Code Civ. Proc., § 339, subd. (1)).

[10] The declaratory relief cause of action in the first amended complaint was the only cause of action arguably not premised on the handling of the loan modification process.

11

**B. Plaintiff's Contentions, Civil Conspiracy, and the Last Overt Act Doctrine**

Plaintiff alleged in the first cause of action that the action against BANA was not time-barred because BANA was part of an ongoing civil conspiracy among defendants. Plaintiff asserts that, under a civil conspiracy theory, the statute of limitations does not begin to run until the last overt act. Plaintiff maintains that the recording of the Notice of Trustee's Sale in August 2014 should be deemed the last overt act, and, therefore, this action insofar as asserted against BANA was not time-barred.

"Proof of a civil conspiracy triggers the 'last overt act' doctrine." (*People ex rel. Kennedy v. Beaumont Investment, Ltd.* (2003) 111 Cal.App.4th 102, 138.) "[W]hen a civil conspiracy is properly alleged and proved, the statute of limitations does not begin to run on any part of a plaintiff's claims until the 'last overt act' pursuant to the conspiracy has been completed." (*Wyatt v. Union Mortgage Co.* (1979) 24 Cal.3d 773, 786.) Thus, we must determine whether the complaint sufficiently alleged a conspiracy between defendants.

## C. Analysis

In the first amended complaint, under the subheading, "Tolling of the Statute of Limitations," plaintiff alleged, in pertinent part: "Plaintiff alleges that Defendants' actions constitute a continuing conspiracy to defraud and take advantage of Defendants [*sic*] and as such, the statute of limitations should be tolled until the completion of the last overt act. Plaintiff alleges that none of the Defendants actually had the intent to grant him a loan modification and that it was Defendants' plan to engage Plaintiff in the loan modification process because they were able to obtain additional compensation for servicing a delinquent mortgage account as well as collect additional fees for every loan

---

However, as to BANA, plaintiff only alleged in that cause of action that it had no right to service or administer the loan because the transfer of the beneficial interest in the loan from BANA to U.S. Bank was void ab initio. As set forth *ante*, any contentions concerning BANA's servicing of the loan, which ceased in early 2010, are time-barred.

12

modification application Plaintiff submitted." Plaintiff further alleged that he was not knowledgeable in matters pertaining to the mortgage or banking industries, that the facts constituting defendants' fraudulent and illegal activities were purposely hidden from him, and that he did not become aware of the extent of defendants' fraudulent and illegal conduct until he retained counsel in August 2014. Plaintiff asserts that each subsequent cause of action incorporated these allegations.

We agree with defendants that plaintiff has offered only conclusory assertions of a conspiracy, rather than alleging any facts that could establish the existence of a conspiracy.

In *Daniels, supra*, 246 Cal.App.4th 1150, the plaintiffs purported to assert a cause of action for civil conspiracy "in which they allege respondents 'conspired' to 'deceive and defraud' them into participating in the loan modification process." (*Id*. at p. 1172.) The *Daniels* court considered "whether appellants adequately allege[d] that [BANA's] misrepresentations were made pursuant to an agreement among [BANA], U.S. Bank, SPS, and ReconTrust to defraud appellants" (*id*. at p. 1173), essentially the same question we must answer in relation to defendants in the instant action for purposes of making our determination as to whether the action against BANA is time-barred. As defendants emphasize, the *Daniels* court concluded: "Appellants' conspiracy allegations are too conclusory. As to the first element, they allege respondents 'agree[d] . . . to deceive [appellants] into participating in the loan modification processes.' There are no factual allegations about the nature of that agreement. Critically, appellants do not allege that respondents agreed to defraud them before the alleged misrepresentations were made (between 2009 and June 2012). Nor can we reasonably infer from the facts alleged that respondents agreed to defraud appellants before the misrepresentations were made, since appellants allege SPS did not become their loan servicer until December 1, 2012 and ReconTrust did not become trustee until August 2012. For these reasons, we conclude the trial court did not err in sustaining SPS and U.S. Bank's demurrer as to the civil

13

conspiracy cause of action without leave to amend, nor in granting [BANA] and ReconTrust's motion for judgment on the pleadings without leave to amend as to that claim." (*Ibid.*)

Similarly, we conclude here that plaintiff's allegations of a civil conspiracy are too conclusory. Like in *Daniels*, plaintiff merely asserted that defendants were involved in a conspiracy to defraud him and asserted that "it was Defendants' plan to engage Plaintiff in the loan modification process because they were able to obtain additional compensation for servicing a delinquent mortgage account as well as collect additional fees for every loan modification application Plaintiff submitted." As in *Daniels*, plaintiff offered no factual allegations about the nature of the alleged conspiracy. (*Daniels, supra*, 246 Cal.App.4th at p. 1173.) Also like in *Daniels*, plaintiff does not, and it appears he cannot, allege that BANA and its codefendants agreed to defraud plaintiff before or at the time any of BANA's misrepresentations were made, all prior to early 2010, during which time BANA remained the servicer of the loan. And, like in *Daniels*, we cannot infer that defendants, including BANA, agreed to defraud plaintiff before such alleged misrepresentations were made because SLS did not begin servicing the loan until 2010, and Nationstar did not begin servicing the loan until 2014. There are no allegations that SLS or Nationstar were involved in any way with plaintiff's loan until those dates, and there are no factual allegations addressing a civil conspiracy during those times in question. SLS and Nationstar were not alleged to have any connection to plaintiff's loan so as to be coconspirators with BANA at the relevant times.

In his reply brief, plaintiff relies on *AREI II Cases* (2013) 216 Cal.App.4th 1004. In that case, the court stated: "It is well settled that ' "[b]are" allegations and "rank" conjecture do not suffice for a civil conspiracy.' [Citation.] A party seeking to establish a civil conspiracy 'must show that each member of the conspiracy acted in concert and came to a mutual understanding to accomplish a common and unlawful plan, and that one or more of them committed an overt act to further it. [Citation.] It is not enough that the

14

[conspirators] knew of an intended wrongful act, they must agree—expressly or tacitly—to achieve it.' [Citation.] It must be recognized, however, that because of the very nature of a conspiracy, 'its existence must often be inferentially and circumstantially derived from the character of the acts done, the relations of the parties and other facts and circumstances suggestive of concerted action.' [Citation.] While a complaint must contain more than a bare allegation the defendants conspired, a complaint is sufficient if it apprises the defendant of the 'character and type of facts and circumstances upon which she was relying to establish the conspiracy.' " (*AREI II Cases*, at p. 1022.) However, here plaintiff has not pled facts and circumstances supporting the existence of the conspiracy.

Plaintiff in his reply brief asserts that he does not rely only on the loan servicers as coconspirators, but also on U.S. Bank. Plaintiff belatedly asserted in his reply brief: "the conduct of all servicers was directed by the purported owner of the Subject Loan," U.S. Bank, and that "U.S. Bank controlled all of the loan servicers who serviced the Subject Loan." Plaintiff asserts that "the conspiracy could reasonably [be] inferred as between each servicer and U.S. Bank, without the need for separate conspiracy analyses."

Where a plaintiff fails to show how the complaint can be amended in his or her opening brief, we may properly regard any belated proposed amendments offered in the plaintiff's reply brief as forfeited. (*Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 52, 56 (*Allen*) [rejecting points raised for the first time in reply brief on appeal without good cause in reviewing trial court's ruling sustaining a demurrer without leave to amend].) " 'Obvious considerations of fairness in argument demand that the appellant present all of his [or her] points in the opening brief. To withhold a point until the closing brief would deprive the respondent of his [or her] opportunity to answer it or require the effort and delay of an additional brief by permission. Hence the rule is that points raised in the reply brief for the first time will not be considered, unless good reason is shown for failure to present them before.' " (*Reichardt v. Hoffman* (1997) 52

15

Cal.App.4th 754, 764, quoting *Neighbours v. Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8; see also *Simpson v. The Kroger Corp.* (2013) 219 Cal.App.4th 1352, 1370 (*Simpson*) ["Raising a new theory in a reply brief is improper and unfair to defendants. We may decline to consider an argument raised for the first time in a reply brief if no good reason is demonstrated for the delay in raising the point"].) Moreover, if we were receptive to this belated attempt to amend the pleadings, we would conclude that these allegations, even if they included reference to BANA, are insufficient to allege a conspiracy between BANA and U.S. Bank.

In the paragraphs of the first amended complaint to which plaintiff cites for these propositions in his reply brief, he merely asserted that an agency agreement existed between U.S. Bank and the servicers; "U.S. BANK and Servicers regularly engaged in business with each other"; an agency relationship existed in which U.S. Bank directed Nationstar's conduct; U.S. Bank's control over Nationstar was pursuant to contract, was comprehensive, and U.S. Bank "directed the conduct of NATIONSTAR throughout the modification process"; and that "upon information and belief, Plaintiff alleges that because [BANA]/NATIONSTAR/SLS were acting as servicers and agents of U.S. BANK, U.S. BANK as principal is liable for all other acts complained of by Plaintiff." These allegations remain insufficient to allow us to infer a civil conspiracy implicating BANA of the sort plaintiff advances here.

Furthermore, according to plaintiff's allegations, U.S. Bank did not acquire its beneficial interest in the loan until BANA's assignment to U.S. Bank in June 2014. Plaintiff alleged that, "[o]n or about, June 23, 2014, an Assignment of Deed of Trust was effectuated whereby [BANA] transferred its purported beneficial interest under the Deed of Trust to the U.S. Bank securitized trust." Assuming this factual allegation to be true (*Daniels, supra*, 246 Cal.App.4th at p. 1162), U.S. Bank could not have conspired with

16

BANA or SLS with regard to the servicing of the loan, as those entities ceased servicing the loan prior to June 2014.[11]

Plaintiff offers in a footnote in his reply brief: "Appellant now realizes that only Nationstar is singled out under some of the allegations in the agency section of the [first amended complaint]. This was inadvertent as the allegations apply to both BANA and SLS, as well." It is not clear to us, however, that this allegation was, in fact, erroneous or inadvertent. According to plaintiff's pleadings, U.S. Bank acquired its beneficial interest in the loan after Nationstar became the servicer of the loan, after BANA and SLS had long since ceased functioning in that role. Assuming that factual allegation to be true (*Daniels, supra*, 246 Cal.App.4th at p. 1162), plaintiff's original allegations "singl[ing] out" Nationstar make sense; no entity other than Nationstar serviced the loan at the time of and following U.S. Bank's acquisition of its beneficial interest in the loan.

Also in his reply brief, plaintiff, in effect, offers to change his theory relative to BANA. For the first time, plaintiff asserts that BANA retained an ownership interest under the deed of trust until June 2014. He cites the allegation in his first amended complaint in which he alleged that, on June 23, 2014, BANA "transferred its purported beneficial interest under the Deed of Trust to the U.S. BANK securitized trust." Plaintiff for the first time in his reply brief now asserts that the first amended complaint alleges that BANA still had an ownership interest in the loan as of mid-2014 and the first amended complaint "does not give rise to the inference that BANA's role in the Subject Loan ended in or about early 2010, when SLS took over the servicing." From this,

---

[11] We note here that plaintiff does not offer any allegations involving an alleged conspiracy between BANA and U.S. Bank in connection with the transfer of the beneficial interest in the loan from BANA to U.S. Bank. Plaintiff's conspiracy allegations are limited to the servicing of the loan and the loan modification process. Nor does plaintiff assert any factual allegations to the effect that BANA, as beneficial owner of the loan as opposed to loan servicer, directed the actions of SLS or Nationstar in servicing the loan in the furtherance of any conspiracy.

plaintiff implies that any action against BANA is not time-barred. Having raised this argument for the first time in his reply brief on appeal, plaintiff has forfeited the issue. (*Allen, supra*, 234 Cal.App.4th at pp. 52, 56; *Simpson, supra*,219 Cal.App.4th at p. 1370.)**12**

Plaintiff asserts that he should have been granted leave to amend the first amended complaint insofar as asserted against BANA. Plaintiff "requests that the trial court's ruling on BANA's demurrer to the [first amended complaint] be overruled as to his first cause of action for intentional misrepresentation." However, once again, we decline to consider new theories and proposed amendments offered for the first time in plaintiff's reply brief on appeal. (*Allen, supra*, 234 Cal.App.4th at pp. 52, 56; *Simpson, supra*, 219 Cal.App.4th at p. 1370.)

### D. Conclusion

We conclude that the trial court properly sustained BANA's demurrer to the first amended complaint without leave to amend because the action insofar as asserted against BANA was time-barred.

---

**12** As discussed during oral argument before this court, plaintiff in no way raised the argument in his opening brief on appeal that the action against BANA was not time-barred because BANA retained a beneficial ownership interest under the deed of trust until June 2014. As stated *ante*, the first and second amended complaints contain allegations that, "[o]n or about, June 23, 2014, an Assignment of Deed of Trust was effectuated whereby [BANA] transferred its purported beneficial interest under the Deed of Trust to the U.S. Bank securitized trust." This allegation was made in a subsection addressed to "Securitization Events," in connection with plaintiff's claim that this transfer was void ab initio. This factual allegation in the complaints was not sufficient to raise, and to avoid forfeiture of, this argument which was not raised in plaintiff's opening brief on appeal and which was raised for the first time in his reply brief.

18

### III. The Action Against U.S. Bank, SLS, and Nationstar[13]

### A. Intentional and Negligent Misrepresentation – Nationstar and U.S. Bank[14]

#### 1. Plaintiff's Contentions

Plaintiff asserts that the trial court's reasoning in sustaining the demurrers as to his misrepresentation claims "was misguided and [plaintiff] should have been given leave to amend his" second amended complaint. According to plaintiff, the thrust of his misrepresentation claims is that defendants never intended to grant him a loan modification, "and that nullified the possibility that they would ever review his modification application in good faith." Plaintiff further asserts that defendants had their representatives make statements to him to imply that further action on his part was necessary to "get the modification process back on track" and had defendants notified him earlier that he could not qualify for a loan modification, he would have "pursued other options." Plaintiff asserts that the fact that he "was solicited to apply for a loan modification program (HAMP) that he never could have qualified for is definitively a material misrepresentation." Because his loan was too large to qualify for HAMP, plaintiff asserts that he "was either fraudulently or negligently enticed into applying for a HAMP loan modification that he could not have, under any circumstances, qualified for. Accordingly, this misrepresentation was a material misrepresentation." Plaintiff further asserts that he relied on defendants' misrepresentations to his detriment. He asserts that

---

[13] Plaintiff does not challenge the trial court's ruling as to his declaratory relief cause of action.

[14] The first and second causes of action in the second amended complaint are expressly asserted against Nationstar, U.S. Bank, and Does 1-50 *only*. These causes of action are not asserted against SLS. Plaintiff specifically alleges that Nationstar and its agents made the intentional and negligent misrepresentations alleged. Thus, we consider these two causes of action on appeal only as asserted against Nationstar and U.S. Bank.

he sustained damages in the form of damage to his credit, increased interest and arrears, lost opportunity for alternatives to foreclosure, and lost time, energy, and effort.

**2. Elements and Pleading of Intentional and Negligent Misrepresentation**

"The essential elements of . . . intentional misrepresentation are (1) a misrepresentation, (2) knowledge of falsity, (3) intent to induce reliance, (4) actual and justifiable reliance, and (5) resulting damage. [Citations.] The essential elements of . . . negligent misrepresentation are the same except that it does not require knowledge of falsity but instead requires a misrepresentation of fact by a person who has no reasonable grounds for believing it to be true." (*Chapman v. Skype Inc.* (2013) 220 Cal.App.4th 217, 230-231.)

"Causes of action for intentional and negligent misrepresentation sound in fraud and, therefore, each element must be pleaded with specificity. [Citations.] 'The specificity requirement means a plaintiff must allege facts showing how, when, where, to whom, and by what means the representations were made, and, in the case of a corporate defendant, the plaintiff must allege the names of the persons who made the representations, their authority to speak on behalf of the corporation, to whom they spoke, what they said or wrote, and when the representation was made.' [Citation.] However, 'the requirement of specificity is relaxed when the allegations indicate that "the defendant must necessarily possess full information concerning the facts of the controversy" [citations] or "when the facts lie more in the knowledge of the" ' defendant. [Citation.] The specificity requirement serves two purposes: 'to apprise the defendant of the specific grounds for the charge and enable the court to determine whether there is any basis for the cause of action.' " (*Daniels, supra*, 246 Cal.App.4th at pp. 1166-1167.)

**3. Analysis**

**a. Misrepresentations**

Among the representations appearing in the first (intentional misrepresentation) and second (negligent misrepresentation) causes of action, plaintiff asserted that

20

defendants' agents repeatedly informed plaintiff that defendants were either not in receipt of all documents requested of plaintiff or that they "required more and more documentation, even though [p]laintiff diligently verified both delivery and receipt of said documents, and each time they were sent." Plaintiff specifically alleged that Nationstar "represented that [p]laintiff was eligible to receive a HAMP loan modification despite the fact that the balance of [p]laintiff's loan precluded him from HAMP eligibility." Plaintiff further alleged that "Nationstar continued to send [p]laintiff HAMP loan modification applications and continually represented to him that he was eligible to apply for and receive a HAMP modification."[15]

Additionally, plaintiff specifically alleged " 'facts showing how, when, where, to whom, and by what means the representations were made, and . . . the names of the persons who made the representations, their authority to speak on behalf of the corporation, to whom they spoke, what they said or wrote, and when the representation was made.' " (*Daniels, supra*, 246 Cal.App.4th at pp. 1166-1167.) Plaintiff alleged that Nationstar, its agents, employees, and representatives, including a named individual, made the representations. He also alleged that the other names and identities of the individuals who made the representations were within the possession of defendant. He represented how, where, and by what means the representations were made, verbally over the phone as well as in writing between Nationstar agents and plaintiff. He alleged that the representations were made between January 2014 and May 2015. He alleged that, as

---

[15] Defendants assert that HAMP application forms are commonly used for other modification programs and thus, simply sending plaintiff this form did not logically imply Nationstar thought him qualified for HAMP. We reject this argument in that it is based on facts not in the complaint or in documents that have been the subject of judicial notice. Moreover, even if the form could be used for other programs, plaintiff specifically alleged that Nationstar represented he was eligible to receive a HAMP modification.

employees, agents, and representatives, the individuals who made the representations had authority to speak for Nationstar.

We conclude that these alleged representations by Nationstar and its agents that plaintiff was eligible to apply for and receive a HAMP modification constitute sufficient misrepresentations as to support intentional and negligent misrepresentation causes of action against Nationstar.[16]  Additionally, in light of plaintiff's allegation that Nationstar acted as an agent for U.S. Bank, we conclude that these representations constitute sufficient misrepresentations as to support intentional and negligent misrepresentation causes of action against U.S. Bank.

### b.  Knowledge of Falsity

Plaintiff alleged that Nationstar and its agents "knew or should have known that Plaintiff would not qualify under the threshold HAMP guidelines.  Nationstar regularly engages in loan modification activities including modifying loans under the HAMP program.  The requirement that the loan amount be no greater than $729,750 is one of the threshold requirements under the HAMP program, and Nationstar knew or should have known that there was no way Plaintiff could qualify for a HAMP modification because his loan balance was more than two times higher than the maximum loan amount for

---

[16] We note that a representation is generally not actionable unless it concerns "past or existing facts."  (*Neu-Visions Sports, Inc. v. Soren/McAdam/Bartells* (2000) 86 Cal.App.4th 303, 309, 310.)  Although a false promise to perform in the future can support a cause of action for intentional misrepresentation, it does not support a cause of action for negligent misrepresentation.  (*Tarmann v. State Farm Mut. Auto. Ins. Co.* (1991) 2 Cal.App.4th 153, 158, 159 ["Simply put, making a promise with an honest but unreasonable intent to perform is wholly different from making one with no intent to perform and, therefore, does not constitute a false promise.  [W]e decline to establish a new type of actionable deceit:  the negligent false promise"].)  Thus, an alleged promise to grant a loan modification does not concern past or existing facts, and cannot be the basis for a negligent misrepresentation cause of action.  However, here, the alleged misrepresentation is that plaintiff *was eligible to apply for and receive* a HAMP modification, which concerns existing facts.

HAMP qualification. Yet, Nationstar continued to send Plaintiff HAMP loan modification applications and continually represented to him that he was eligible to apply for and receive a HAMP modification." (Capitalization omitted.)

This was sufficient to allege knowledge of falsity.

### c. Intent to Induce Reliance

According to the second amended complaint, Nationstar "intended to induce Plaintiff['s] reliance so that Nationstar could keep Plaintiff in the modification process, collect additional fees for servicing a delinquent mortgage, and ultimately foreclose upon the Subject Property. Further, Plaintiff alleges that Nationstar received additional compensation for every loan modification application they received from Plaintiff." (Capitalization omitted.) Elsewhere, plaintiff alleged that the misrepresentations "were part of Defendants' overall scheme to keep Plaintiff in a modification process it never intended to complete in order to accrue fees and penalties to which it would not have been entitled had Plaintiff never entered into the modification process in the first place. Most, if not all, of the misrepresentations were designed to provide Plaintiff with the false hope that a modification would be granted in order to induce him to continue with the process, even after Defendants had issued denials."

We conclude that these statements were sufficient to allege intent to induce reliance.

### d. Actual and Justifiable Reliance

Plaintiff alleged in his second amended complaint that he was justified in relying on Nationstar's misrepresentations "because Nationstar is the servicer of the Subject Loan and regularly engages in the process of offering HAMP loan modifications in accordance with HAMP guidelines and Nationstar sent HAMP applications to Plaintiff on multiple occasions." (Capitalization omitted.) Elsewhere, plaintiff alleged that, "had Plaintiff known that Defendants never intended to grant him a modification, he would not

23

have continued in the process and would have either sold the property or sought the aid of family instead of allowing Defendants to unjustifiably enrich themselves at his expense."

Plaintiff was already in default at the relevant times. According to the allegations of the second amended complaint, based on Nationstar's misrepresentations about his application and eligibility for a HAMP loan modification, plaintiff forewent other means to become current on his loan or even sell his property. Plaintiff allegedly did so in reliance on the representations of Nationstar, a mortgage loan servicer which regularly worked with HAMP loan modifications.

We conclude that plaintiff adequately pleaded actual and justifiable reliance.[17]

### e. Damages

Plaintiff alleged: "As a proximate result of Defendants' conduct in violating their promises and representations to Plaintiff, Plaintiff has suffered injury, damage to his credit, increased interest and arrears that he would not have otherwise incurred, faces the loss of the Subject Property through foreclosure, and forewent seeking other remedies to cure the default. Further, Defendants charged additional late fees and penalties to Plaintiff's mortgage account. Plaintiff expended time, energy and effort into the loan modification process, granting Defendant access to his personal financial records, which they would not have been entitled to receive . . . . Plaintiff has had to retain an attorney, expend legal costs and have suffered further damages in an amount to be shown according to proof at the time of trial."

Plaintiff alleged that he was suffering harm to his credit following BANA's freezing of his accounts in 2008, six years before any misrepresentations by Nationstar.

---

[17] Defendants assert that plaintiff easily could have discovered the qualifications for HAMP loan modifications through online and other research, and therefore he cannot establish justifiable reliance. We agree with plaintiff that defendants' assertions are factual allegations outside of the pleadings and have no place in our determination as to whether plaintiff has stated a cause of action.

However, construing the second amended complaint liberally (*Longshore, supra*, 25 Cal.3d at p. 22; *Daniels, supra*, 246 Cal.App.4th at p. 1162), he also alleges that his credit continued to suffer ongoing damage.

The complaint further alleges plaintiff might have pursued "other remedies" and "alternative remedies" had he not relied on Nationstar's alleged misrepresentations. At one point, plaintiff refers to other remedies, "such as refinancing while there was equity in the property, a short sale of the property, borrowed money from family and friends, or organized investors to pay off the delinquent balance."[18]

Additionally, plaintiff claims to have been damaged in the form of increased interest, arrears, penalties, and fees that he would not have otherwise incurred.

Plaintiff further alleges that he expended time, energy and effort in the loan modification process. In *Bushell v. JPMorgan Chase Bank, N.A.* (2013) 220 Cal.App.4th 915 (*Bushell*), another panel of this court recited that the plaintiffs alleged they sustained damages "by the considerable time they spent repeatedly contacting Chase and repeatedly preparing documents at Chase's request; by discontinuing efforts to pursue a refinance from other financial institutions or to pursue other means of avoiding foreclosure (such as bankruptcy restructuring, or selling or renting their home); by having their credit reports further damaged; and by losing their home and making it unlikely they could purchase another one." (*Id*. at p. 928.) The *Bushell* court concluded that the plaintiffs adequately alleged damages in connection with their fraud cause of action. (*Id*. at pp. 928, 930, 931; but see *Lueras, supra*, 221 Cal.App.4th at p. 79 [time and effort spent assembling materials for loan modification application amounts to a "sort of nominal damage subject to the maxim *de minimis non curat lex*—i.e., the law does not concern itself with trifles"].)

---

[18]  See footnote 23, *post*.

Liberally construing plaintiff's allegations, as we must (*Longshore, supra*, 25 Cal.3d at p. 22; *Daniels, supra*, 246 Cal.App.4th at p. 1162), we conclude that plaintiff has sufficiently pled damages resulting from Nationstar's (and, by extension, U.S. Bank's) alleged intentional and negligent misrepresentations.[19]

### f. Conclusion

Because plaintiff sufficiently pled each element of the causes of action alleging intentional and negligent misrepresentations, we conclude that the trial court erred in sustaining Nationstar and U.S. Bank's demurrer to the first and second causes of action.

## B. Negligence – SLS, Nationstar, and U.S. Bank

### 1. Plaintiff's Contentions

Plaintiff maintains that he adequately pleaded the third cause of action sounding in negligence. According to plaintiff, the trial court erroneously determined that defendants did not owe plaintiff a duty of care because their involvement did not exceed the scope of a normal financial institution. Plaintiff asserts that we must undertake a *Biakanja* analysis to determine whether defendants owed plaintiff a duty of care. (*Biakanja*, *supra*, 49 Cal.2d at p. 650.) And plaintiff asserts that a balancing of the *Biakanja* factors favors

---

[19] Relevant to damages, plaintiff also alleged that he was forced to file a bankruptcy petition to stop the foreclosure sale on the property. However, this occurred while BANA was still the loan servicer, long before Nationstar, or its misrepresentations, would be implicated. Moreover, while plaintiff alleges that he "faces the loss of the Subject Property through foreclosure," he does not allege that the subject property was indeed foreclosed upon. Facing the possibility of foreclosure, without more, does not amount to compensable damages. Finally, plaintiff's reference to retaining an attorney and legal costs would not give rise to compensable damages. (*Khajavi v. Feather River Anesthesia Medical Group* (2000) 84 Cal.App.4th 32, 62 [" 'In the absence of a statute authorizing attorneys' fees as an element of damages, or of a contract to pay such fees in event of the party's recovery, attorneys' fees paid by a successful party in an action are never recoverable against the unsuccessful party' "].)

a finding of a duty of care. He further asserts that he properly pleaded duty, breach, and damages.

Plaintiff relies on this court's decision in *Rossetta v. CitiMortgage, Inc.* (2017) 18 Cal.App.5th 628 (*Rossetta*), where we concluded that the complaint therein sufficiently alleged a negligence cause of action, including a duty of care, against a loan servicer for its handling of a loan modification application. Defendants assert that *Rossetta* does not apply because a fact they find crucial to the duty of care—the loan servicer's direction making default a condition for being considered for a loan modification—is not present here. Defendants insist this factor "carried *Rossetta* across the line." According to defendants, plaintiff does not allege any other facts sufficient to give rise to a duty of care. As we shall explain, we disagree with defendants.

## 2. Elements of Negligence and the Negligence Allegations in the Second Amended Complaint

To support a negligence cause of action, a plaintiff must plead and prove: (1) the defendant owed the plaintiff a legal duty, (2) the defendant breached the duty, and (3) the breach was a proximate or legal cause of the plaintiff's injuries. (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 477.) "We start by identifying the allegedly negligent conduct by [defendants] because our analysis is limited to 'the specific action the plaintiff claims the particular [defendants] had a duty to undertake in the particular case.' " (*Lueras, supra*, 221 Cal.App.4th at p. 62, quoting *Vasquez v. Residential Investments, Inc.* (2004) 118 Cal.App.4th 269, 280.)

The second amended complaint alleges that Nationstar, SLS, and U.S. Bank acted unreasonably throughout the loan modification process "by failing to accurately and reasonably evaluate Plaintiff for a loan modification"; by mishandling and losing plaintiff's financial documents; by "misdirect[ing] Plaintiff"; by failing to inform plaintiff of the documents that were required for the loan modification; by forcing plaintiff to submit the same documents repeatedly; and by misrepresenting that plaintiff was eligible

for a HAMP loan modification for which his loan was not qualified. Plaintiff asserted that, as a proximate cause of defendants' negligence, plaintiff "suffered injury, damage to his credit, increased interest and arrears that he would not have otherwise incurred, forewent seeking other remedies and solutions, has incurred legal fees and costs, and now face[s] the possible foreclosure proceedings and the loss of the Subject Properties."

### 3. Duty of Care

"Recovery in a negligence action depends as a threshold matter on whether the defendant had ' "a duty to use due care toward an interest of [the plaintiff's] that enjoys legal protection against unintentional invasion." ' " (*Gas Leak, supra*, 7 Cal.5th at p. 397.) "Whether a duty of care exists is a question of law to be determined on a case-by-case basis." (*Lueras, supra*, 221 Cal.App.4th at p. 62.)

"[A]s a general rule, a financial institution owes no duty of care to a borrower when the institution's involvement in the loan transaction does not exceed the scope of its conventional role as a mere lender of money." (*Nymark v. Heart Fed. Savings & Loan Assn.* (1991) 231 Cal.App.3d 1089, 1096 (*Nymark*).) Additionally, California law generally does not impose a duty of care to avoid causing purely economic losses in negligence cases. (*Gas Leak, supra*, 7 Cal.5th at pp. 398-400.) But our high court has recognized an exception when the plaintiff and defendant have a "special relationship." (*Ibid.*, citing *J'Aire Corp. v. Gregory* (1979) 24 Cal.3d 799, 804 (*J'Aire*) [a special relationship gives rise to a duty on the part of the defendant to use due care to avoid economic injury to the plaintiff].) The *Gas Leak* court explained, "*[w]hat we mean by special relationship is that the plaintiff was an intended beneficiary of a particular transaction but was harmed by the defendant's negligence in carrying it out*," and cited *Biakanja, supra,* 49 Cal.2d 647, as an example. (*Gas Leak,* at p. 400, italics added.)

Previously, courts have stated that the question of whether a special relationship exists is determined by applying the six factors set forth *Biakanja*. For example, writing about *J'Aire*, our high court in *Aas v. Superior Court* (2000) 24 Cal.4th 627, stated:

28

"Applying the *Biakanja* factors, the court [in *J'Aire*] held that a 'special relationship' [citation] permitting recovery of economic losses (i.e., the relationship defined by the *Biakanja* test) existed between the contractor and the tenant." (*Id.* at p. 644; see also *North American Chemical Co. v. Superior Court* (1997) 59 Cal.App.4th 764, 782 ["The necessary 'special relationship' required by *J'Aire* was established by consideration of six criteria first articulated by the *Biakanja* court"]; *Zamora v. Shell Oil Co.* (1997) 55 Cal.App.4th 204, 211-212 [noting that "[t]he California Supreme Court adopted a six-part test for determining when a 'special relationship' exists between parties which would permit recovery in a negligence action for economic losses alone"]; *Ott v. Alfa-Laval Agri, Inc.* (1995) 31 Cal.App.4th 1439, 1450, 1454 [courts apply the six-part *Biakanja* test employed in *J'Aire* for deciding whether a special relationship exists; the test applies whether or not the parties are in contractual privity].)

In *Gas Leak*, our high court clarified: "Discerning whether there is a special relationship justifying liability of this sort can nonetheless be a subtle enterprise. In both *Biakanja* and *J'Aire* we emphasized that our duty determination rested not just on (i) 'the extent to which the transaction was intended to affect the plaintiff,' but also on" the factors articulated in *Biakanja* and *J'Aire*. (*Gas Leak, supra*, 7 Cal.5th at p. 401.) The *Biakanja* factors are: (1) the extent to which the transaction was intended to affect the plaintiff, (2) the foreseeability of harm to the plaintiff, (3) the degree of certainty that the plaintiff suffered injury, (4) the closeness of the connection between the defendant's conduct and the injury suffered, (5) the moral blame attached to the defendant's conduct, and (6) the policy of preventing future harm. (*Rossetta, supra*, 18 Cal.App.5th at p. 637; *Nymark, supra*, 231 Cal.App.3d at p. 1098, citing *Biakanja*, 49 Cal.2d at p. 650.)

Thus, in considering whether a duty exists here, we shall both (1) weigh the factors set forth in *Biakanja*, and (2) focus particular attention on whether this is a case where plaintiff was intended to benefit from the transaction but was harmed by the defendant's negligence in carrying it out. (*Gas Leak, supra*, at pp. 400, 401.) However,

29

before applying the *Biakanja* factors here, we first review other cases applying those factors to a negligence cause of action arising out of loan modifications.

Several courts, including this one, have found a duty after applying the *Biakanja* factors, when the lender or servicer has voluntarily undertaken to renegotiate a loan modification but breached the duty to exercise reasonable care in processing the loan modification application. (*Rossetta, supra*, 18 Cal.App.5th at p. 640 [residential loan]; *Daniels, supra*, 246 Cal.App.4th at pp. 1180-1183 [residential loan]; *Alvarez v. BAC Home Loans Servicing, L.P.* (2014) 228 Cal.App.4th 941, 946, 949 (*Alvarez*) [residential loan]; *Jolley v. Chase Home Finance, LLC* (2013) 213 Cal.App.4th 872, 881 (*Jolley*) [construction loan].)

Relevant to a duty of care, the plaintiffs in *Alvarez* alleged "that defendants owed them a duty to exercise reasonable care in the review of their loan modification applications once they had agreed to consider them. The complaint allege[d] . . . that defendants 'undertook to review' plaintiffs' loans for potential modification under [HAMP] and that having done so they owed plaintiffs the duty to exercise reasonable care in processing and reviewing their applications for loan modifications in accordance with the federal HAMP guidelines." (*Alvarez, supra*, 228 Cal.App.4th at pp. 944-945.) The *Alvarez* court weighed the *Biakanja* factors, considered relevant case law, and concluded that "the *Biakanja* factors clearly weigh in favor of a duty. The transaction was intended to affect the plaintiffs and it was entirely foreseeable that failing to timely and carefully process the loan modification applications could result in significant harm to the applicants. Plaintiffs allege that the mishandling of their applications 'caus[ed] them to lose title to their home, deterrence from seeking other remedies to address their default and/or unaffordable mortgage payments, damage to their credit, additional income tax liability, costs and expenses incurred to prevent or fight foreclosure, and other damages.' As stated in [*Garcia v. Ocwen Loan Servicing, LLC* (N.D.Cal. May 10, 2010, C 10-0290 PVT) 2010 U.S. Dist. Lexis 45375, 2010 WL 1881098], 'Although there was

no guarantee the modification would be granted had the loan been properly processed, the mishandling of the documents deprived Plaintiff of the possibility of obtaining the requested relief.' " (*Alvarez,* at pp. 948-949.) The court found particularly significant the fifth *Biakanja* factor—the moral blame attached to the defendant's conduct—stating, "it is highly relevant that the borrowers['] 'ability to protect his own interests in the loan modification process [is] practically nil' and the bank holds 'all the cards.' " (*Alvarez,* at p. 949.) In considering the sixth *Biakanja* factor—preventing future harm—the *Alvarez* court took note of the Legislature's " 'strong preference for fostering more cooperative relations between lenders and borrowers who are at risk of foreclosure, so that homes will not be lost.' " (*Id*. at p. 950.) This legislative preference was expressed through passage of the California Homeowner Bill of Rights (Assem. Bill No. 278 (2011-2012 Reg. Sess.); Sen. Bill No. 900 (2011-2012 Reg. Sess.)), which, among other things, attempted to eliminate dual tracking.[20] (*Alvarez,* at p. 950.)

Other courts have reached a different conclusion. Defendants rely on *Lueras, supra*, 221 Cal.App.4th 49. The plaintiff asserted in *Lueras* that the defendants "owed him a duty of care to (1) handle his loan 'in such a way to prevent foreclosure and forfeiture of his property'; (2) 'determine modification approvals, explore and offer foreclosure alternatives with Mr. Lueras prior to default'; (3) 'exercise reasonable care and skill in timely and accurately responding to customer requests and inquiries'; (4) 'record proper land records'; (5) 'properly service the loan'; (6) 'ensure chain of title prior to foreclosing'; and (7) 'stop all foreclosure sales that are unlawful.' " (*Id*. at p. 62.) The plaintiff also alleged that the defendants had a duty to offer him a loan modification and breached that duty by refusing to do so. (*Id*. at p. 63.) The *Lueras* court stated: "We

---

[20] "Dual tracking" refers to where a bank, lender, or similar institution "initiate[s] a loan modification review while simultaneously proceeding with foreclosure . . . ." (*Majd v. Bank of America, N.A.* (2015) 243 Cal.App.4th 1293, 1302 (*Majd*).)

31

conclude a loan modification is the renegotiation of loan terms, which falls squarely within the scope of a lending institution's conventional role as a lender of money.  A lender's obligations to offer, consider, or approve loan modifications and to explore foreclosure alternatives are created solely by the loan documents, statutes, regulations, and relevant directives and announcements from the United States Department of the Treasury, Fannie Mae, and other governmental or quasi-governmental agencies.  The *Biakanja* factors do not support imposition of a common law *duty to offer or approve a loan modification*.  If the modification was necessary due to the borrower's inability to repay the loan, the borrower's harm, suffered from denial of a loan modification, would not be closely connected to the lender's conduct.  If the lender did not place the borrower in a position creating a need for a loan modification, then no moral blame would be attached to the lender's conduct." (*Lueras,* at p. 67, italics added.)

Plaintiff asserts that *Alvarez* and *Lueras* are not actually in conflict because, in *Lueras*, the court only concluded that the *Biakanja* factors did not support the "imposition of a common law *duty to offer or approve a loan modification*" (*Lueras, supra*, 221 Cal.App.4th at p. 67, italics added), whereas the *Alvarez* court focused its discussion on the actual misconduct alleged and concluded that the *Biakanja* factors may weigh in favor of the imposition of a duty when the loan servicer agrees to *consider* a loan modification.  (*Alvarez, supra*, 228 Cal.App.4th at p. 948.)  This may be true, but whether or not these lines of cases are in direct conflict, they are not strictly aligned.  In *Rossetta*, we noted that "California Courts of Appeal have not settled on a uniform application of the *Biakanja* factors in cases that involve a loan modification.  Although lenders have no duty to offer or approve a loan modification [citation], courts are divided on the question of whether accepting documents for a loan modification is within the scope of a lender's conventional role as a mere lender of money, or whether, and under what circumstances, it can give rise to a duty of care with respect to the processing of the loan modification application." (*Rossetta, supra*, 18 Cal.App.5th at pp. 637-638, comparing *Lueras, supra*,

32

221 Cal.App.4th at p. 67, with *Alvarez, supra*, 228 Cal.App.4th at p. 948, *Daniels, supra*, 246 Cal.App.4th at pp. 1180-1183, and *Jolley, supra*, 213 Cal.App.4th at p. 906.)

While courts agree that a lender has no duty to *offer or approve* a loan modification (*Rossetta, supra*, 18 Cal.App.5th at pp. 637-638), whether a lender assumes a duty by considering a loan modification application presents a more nuanced question: At what point may it be said that "a borrower and lender enter into a new phase of their relationship when they voluntarily undertake to renegotiate a loan, one in which the lender usually has greater bargaining power and fewer incentives to exercise care"? (See *Rossetta,* at p. 640, citing *Alvarez, supra*, 228 Cal.App.4th at p. 949.)

In *Alvarez*, the court noted that the plaintiffs had alleged "that defendants owed them a duty to exercise reasonable care in the review of their loan modification applications *once they had agreed to consider them*." (*Alvarez, supra*, 228 Cal.App.4th at p. 944, italics added.) Their complaint further alleged that the defendants " 'undertook to review' plaintiffs' loans for potential modification under" HAMP and that "having done so they owed plaintiffs the duty to exercise reasonable care in processing and reviewing their applications for loan modifications in accordance with the federal HAMP guidelines." (*Id*. at pp. 944-945.) The *Alvarez* court concluded that, "because defendants allegedly agreed to consider modification of the plaintiffs' loans, the *Biakanja* factors clearly weigh in favor of a duty." (*Alvarez,* at p. 948.)

Here, leaving aside the allegations asserted against BANA because they are time-barred,[21] plaintiff alleged in the second amended complaint that, once SLS acquired

---

[21] Plaintiff repeatedly discusses BANA's alleged conduct in freezing plaintiff's accounts and line of credit in terms of both moral blameworthiness for purposes of the *Biakanja* analysis and in terms of breach. However, as we have held in the unpublished portion of this opinion, the action against BANA is time-barred, and plaintiff has offered no reason, other than his conclusory allegations of a civil conspiracy, why U.S. Bank or the subsequent loan servicers should be liable for the alleged misdeeds of BANA as their predecessor. (Cf. *Daniels, supra*, 246 Cal.App.4th 1169-1170 [rejecting each of the

servicing rights of plaintiff's loan in 2010, SLS notified plaintiff that it would "handl[e] [p]laintiffs' loan modification application." However, SLS refused to honor the terms of the loan modification BANA had offered, despite the alleged fact that plaintiff's wife had tendered the $50,000 payment. Plaintiff alleged that he submitted applications and documents to SLS on numerous occasions. According to plaintiff, during this time, "SLS continued to represent that Plaintiff would be approved for a loan modification with similar terms to the loan modification offered by" BANA.

In 2014, the servicing rights to the loan were transferred to Nationstar, which informed plaintiff that he had to begin the loan modification process anew. Plaintiff again submitted his applications and documents repeatedly. He was instructed where to send documents, including locations in three different states. A named Nationstar representative told plaintiff that he was eligible to apply for a HAMP loan modification and sent him the applications. Nationstar represented "[o]ver the phone and in writing" that Plaintiff was eligible to apply for and receive a HAMP loan modification. Plaintiff submitted the HAMP loan modification application on several occasions. Plaintiff alleged that Nationstar knew plaintiff's loan was ineligible for a HAMP loan modification because the balance was far more than the $729,750 maximum, but had him apply anyway while maintaining his delinquency.

Turning back to *Rossetta*, we stated: "We do not hold that a duty of care arises merely because a lender receives or considers a loan modification application. Nor do we hold . . . that a duty of care may arise solely by virtue of the parties' changing relationship. Rather, we conclude that the change in the parties' relationship can and should be factored into our application of the *Biakanja* factors." (*Rossetta, supra*, 18 Cal.App.5th at p. 640.) We continued: "To this end, we find it significant that

---

plaintiffs' contentions as to why successor loan servicer should be liable for conduct of predecessor loan servicer but granting the plaintiffs leave to amend to address the issue].)

CitiMortgage allegedly refused to consider Rossetta's loan modification application until she was three months behind in her mortgage payments. By making default a condition of being considered for a loan modification, CitiMortgage did more than simply enhance its already overwhelming bargaining power; it arguably directed Rossetta's behavior in a way that potentially exceeds the role of a conventional lender. [Citation.] At a minimum, the alleged policy of making default a condition of being considered for a loan modification informs our application of the *Biakanja* factors [citation], to which we now turn." (*Rossetta,* at pp. 640-641.) Thus, while we found significant the direction to the plaintiffs in *Rossetta* to go into default and that it would inform our application of the *Biakanja* factors, we did not conclude that that circumstance was a predicate to a finding of a duty. Other factors may also be considered.

For example, here the alleged representations by SLS that plaintiff would be approved for the modification could be viewed as a guarantee and constitutes involvement exceeding the scope of the conventional money lending role. Also beyond the scope of the role of a conventional lender is the alleged misrepresentation by Nationstar that plaintiff was eligible to apply for and receive a HAMP modification when he clearly was not. Indeed, these observations are consistent with *Lueras*. There, in noting that a lender owes a duty to the borrower not to make material misrepresentations about the status of a loan modification application or the date, time or status of a foreclosure sale, the court expressly stated: "The law imposes a duty not to make negligent misrepresentations of fact." (*Lueras, supra*, 221 Cal.App.4th at p. 68.) Here, plaintiff has alleged that defendant loan servicers made material misrepresentations.

We now proceed to consider the *Biakanja* factors as applied to the allegations in this case.

#### 4. Application of the *Biakanja* Factors

##### a. The Extent to Which Transaction Was Intended to Affect Plaintiff

The loan modification transaction would affect both plaintiff, as the borrower and homeowner, and defendants as the loan servicers and the loan owner. As the court in *Daniels* stated: " ' "[u]nquestionably" ' the transaction was intended to affect appellants, as ' "[t]he decision on [appellants'] loan modification application would determine whether or not [they] could keep [their] home" ' and at what cost. [Citation.] Moreover, it was appellants who 'specifically brought to [BANA's] attention' their desire for a loan modification. [Citation.] Respondents correctly note that the transaction also was intended to affect and benefit the lender by maximizing its return. But that does not mean it was not also intended to affect appellants . . . . [Citation.] We conclude the first factor weighs slightly in favor of finding a duty of care." (*Daniels, supra*, 246 Cal.App.4th at p. 1182.) Here, we too conclude the first factor weighs in favor of finding a duty of care.

##### b. The Foreseeability of Harm to Plaintiff

It would be foreseeable that plaintiff would suffer harm as a result of the defendant loan servicers negligently processing plaintiff's loan modification application. Plaintiff potentially stood to lose his home based on the outcome of the modification process. " ' "[T]he mishandling of the documents deprived Plaintiff of the possibility of obtaining the requested relief." ' " (*Rossetta, supra*, 18 Cal.App.5th at p. 641, quoting *Alvarez, supra*, 228 Cal.App.4th at p. 948.) Additionally, defendants assured plaintiff that he was eligible for and would be approved for or receive a loan modification; thus it was foreseeable that plaintiff would forgo attempting to sell the home or obtain alternative funding based on these alleged representations. It was also foreseeable that plaintiff would accrue additional arrears, penalties, fees, and harm to his credit. And it was foreseeable that plaintiff would expend considerable time repeatedly contacting SLS and Nationstar and preparing documents at their request. (See *Bushell v. JPMorgan Chase*

*Bank, N.A.* (2013) 220 Cal.App.4th 915, 928 (*Bushell*).) Thus, this factor favors the finding of a duty of care.

### c. The Degree of Certainty Plaintiff Suffered Injury

Plaintiff alleges that he suffered injury in the form of damage to his credit, increased interest and arrears, forgone opportunities to pursue other remedies and the expenditure of time repeatedly contacting SLS and Nationstar and preparing documents he sent multiple times. We need not consider the extent of these injuries, a matter that is a question of fact. Nor are we required to find that all of these injuries can be proven. For purposes of determining whether facts supporting a duty have been stated in the complaint, we need only determine whether the facts in the second amended complaint establish that some injuries are certain.[22] We conclude that plaintiff's allegations adequately establish certainty of injury at this stage of the proceedings. (See *Rossetta, supra*, 18 Cal.App.5th at p. 641; *Daniels, supra*, 246 Cal.App.4th at p. 1182.) Accordingly, we conclude the third *Biakanja* factor weighs in favor of finding a duty of care.

---

[22] Defendants assert plaintiff alleged no facts to show there was any "realistic chance" of an alternative to avoid foreclosure. They assert the allegation that plaintiff " 'forewent seeking other remedies to cure the default' " were conclusory and implausible. They assert that the "bankruptcy filing showed the property was 'underwater'—worth less than the loan it secured. So no lender would likely refinance the property." Normally, we would expect more specificity by a plaintiff, but where, as here, plaintiff's allegations indicate he was told he would receive a modification by SLS and he was told he would receive a HAMP modification by Nationstar, it may be reasonably inferred he did not fully investigate alternatives as a result of those representations. What damages were realistic under this circumstance represents a question of fact that cannot be resolved by demurrer. As for the loan being more than the home was worth, we acknowledge that the bankruptcy filing at the page of the record cited by defendants indicates as much. However, the bankruptcy filing does not indicate how much the home was worth or the difference between the amount owed and the value of the home. Again, whether selling the home to investors or otherwise was realistic is a question of fact that cannot be resolved at this stage of the case.

### d. The Closeness of the Connection Between Defendants' Conduct and Injury

The second amended complaint alleges that plaintiff was current on his mortgage payments until BANA froze his accounts. Thereafter, defendants SLS and Nationstar successively strung plaintiff along in the loan modification process, allegedly causing the damages set forth *ante*. SLS assured plaintiff he would be approved for the modification and Nationstar represented plaintiff was eligible to apply for and receive a HAMP modification. Therefore, over and over again, he continued to submit his applications for loan modifications. While it is clear a lender does "not have a common law duty of care to offer, consider, or approve a loan modification, or to offer [the borrower] alternatives to foreclosure" (*Lueras, supra*, 221 Cal.App.4th at p. 68), defendants here allegedly made representations to plaintiff reassuring him of his ultimate success with the process, thus going beyond the mere consideration of his loan modification applications. SLS's and Nationstar's conduct is connected to plaintiff's asserted injuries. "Construing the complaint liberally, as we must, we conclude the fourth *Biakanja* factor weighs in favor of finding a duty of care." (*Rossetta, supra*, 18 Cal.App.5th at p. 642.)

### e. The Moral Blame Attached to Defendants' Conduct

As we have said, plaintiff's allegations go beyond the loan servicers negligently processing his loan modification applications. Rather, he alleges that SLS and Nationstar deliberately strung him along for their own benefit, and to plaintiff's detriment. According to plaintiff's allegations, by doing so, SLS and Nationstar would continue to collect fees in servicing a delinquent account. Plaintiff, meanwhile, would continue to accrue additional arrears, penalties, fees, and harm to his credit.

As we concluded in *Rossetta*, "the borrower's lack of bargaining power, coupled with the lender's alleged incentive to unnecessarily prolong the loan modification process, 'provide a moral imperative that those with the controlling hand be required to exercise reasonable care in their dealings with borrowers seeking a loan modification.' "

(*Rossetta, supra*, 18 Cal.App.5th at p. 642, quoting *Alvarez, supra*, 228 Cal.App.4th at p. 949.)  Moreover, based on plaintiff's allegations, SLS and Nationstar are particularly blameworthy given the misrepresentations they allegedly made to plaintiff.  While we found in *Rossetta* that the defendant's moral blame was "heightened" because it induced the plaintiff to default (*Rosetta,* at p. 642), a circumstance that is not alleged here, we nevertheless conclude that moral blame here is heightened by the loan servicers' alleged misrepresentations regarding the loan modification plaintiff sought.  We conclude that the fifth *Biakanja* factor weighs in favor of finding a duty of care.

### f.  Policy of Preventing Future Harm

Agreeing with *Alvarez*, we stated in *Rossetta*:  "with respect to the sixth factor, the legislature has enacted the California Homeowner Bill of Rights, which 'demonstrates "a rising trend to require lenders to deal reasonably with borrowers in default to try to effectuate a workable loan modification" ' and ' "expressed a strong preference for fostering more cooperative relations between lenders and borrowers who are at risk of foreclosure, so that homes will not be lost." '  [Citations.]  Imposing a duty of care in the particular circumstances of this case would serve the policies underlying these legislative preferences, and prevent future harm to borrowers, by giving lenders an incentive to handle loan modification applications in a timely and responsible manner.  [Citation.] We conclude the sixth *Biakanja* factor weighs in favor of finding a duty of care." (*Rossetta, supra*, 18 Cal.App.5th at pp. 642-643, quoting *Alvarez, supra*, 228 Cal.App.4th at p. 950.)

However, we note that the court in *Daniels* concluded that the policy of preventing future harm appears to cut both ways.  " 'Imposing negligence liability may give lenders an incentive to handle loan modification applications in a timely and responsible manner. On the other hand, absent a duty in the first place to modify a loan or even to evaluate such an application under objective standards limiting the lender's discretion, imposing negligence liability for the mishandling of loan modification applications could be a

39

disincentive to lenders from ever offering modification.' " (*Daniels, supra*, 246 Cal.App.4th at p. 1183.) For these reasons, the *Daniels* court concluded it could not say whether or not the imposition of a duty would prevent future harm to borrowers. (*Ibid.*)

Here, however, we conclude that this factor favors the finding of a duty of care. In addition to serving the policies underlying legislative preferences we discussed in *Rossetta*, future harm will be avoided by preventing servicers from stringing borrowers along, making misrepresentations and reassuring borrowers that they will receive loan modifications.

### g. Weighing the *Biakanja* Factors

Having carefully weighed the *Biakanja* factors, we conclude the allegations in the second amended complaint adequately allege a cause of action for negligence that is sufficient to survive demurrer.

### 5. Special Relationship Exception to the No Tort Duty for Economic Losses Rule

While this appeal was pending, our colleagues in the Court of Appeal, Second District, Division Eight, decided *Sheen v. Wells Fargo Bank, N.A.* (2019) 38 Cal.App.5th 346, review granted, Nov. 13, 2019, S258019 (*Sheen*). Applying the rule that there is no tort duty for purely economic losses, the court declined to find a duty in the context of residential loan modification negotiations. (*Sheen,* at p. 348.) The *Sheen* court relied on the approach taken by our high court in *Gas Leak, supra*, 7 Cal.5th 391, and the Restatement of Torts. We disagree with *Sheen*, because it did not consider the special relationship exception our high court discussed in *Gas Leak*.

In *Gas Leak*, residents in a Los Angeles suburb were forced to relocate due to a leak at a major natural gas storage facility. The local economy was devastated as a result. (*Gas Leak, supra*, 7 Cal.5th at pp. 395-396.) Business entities in the area sued for economic losses resulting from the loss of business previously generated by the relocated residents. (*Id.* at p. 396.) Following the rule adopted in numerous other jurisdictions and

40

the Restatement of Torts, our high court rejected the plaintiffs' contention that the gas company had a tort duty to guard against purely economic losses. (*Gas Leak,* at pp. 394-395, 403-408.)

However, our high court was careful to point out that there is an exception to this general rule. When there is a special relationship between a plaintiff and the defendant, California law permits recovery solely for economic losses. (*Gas Leak, supra*, 7 Cal.5th at p. 400.) The court in *Gas Leak* expressly stated that the case before it did not involve a special relationship (*id*. at p. 408), but recognized *Biakanja* as an example of a special relationship case.[23] (*Gas Leak*, at p. 400.) As we have noted, the *Gas Leak* court described a "special relationship" as one where "the plaintiff was an intended beneficiary of a particular transaction but was harmed by the defendant's negligence in carrying it out." (*Ibid*.) Later in the opinion, in describing the majority rule barring tort liability for economic damages, the court wrote: the "consensus cuts sharply against imposing a duty of care to avoid causing purely economic losses in negligence cases like [the case before the court]: where purely economic losses flow *not from a financial transaction meant to benefit the plaintiff (and which is later botched by the defendant)*, but instead from an industrial accident caused by the defendant (and which happens to occur near the plaintiff)." (*Id*. at p. 403, italics added.) Based upon the italicized text, we think our high court excludes from the no-tort-duty-for-economic-damages rule claims for economic damages arising from "botched" financial transactions meant to benefit the plaintiff.

---

[23] Describing *Biakanja*, the court in *Gas Leak* wrote: "There, we held that the intended beneficiary of a will could recover for assets she would have received if the notary had not been negligent in preparing the document. [Citation.] A special relationship existed between the intended beneficiary and the notary in *Biakanja*, we emphasized, because 'the "end and aim" of the transaction' between the nonparty decedent and the notary was to ensure that the decedent's estate passed to the intended beneficiary." (*Gas Leak, supra*, 7 Cal.5th at p. 400.)

Applying *Biakanja* and *Gas Leak*, we conclude that a special relationship exists in this case, a circumstance apparently not considered by the court in *Sheen* because the special relationship exception is not referenced anywhere in the opinion.  Here, the borrower is an intended beneficiary of the modification transaction and this, along with the *Biakanja* factors, establishes a special relationship and duty.

There is a further consideration that supports our conclusion that a special relationship warranting a finding of duty exists in this case.  Plaintiff here had no choice as to the entities with which he negotiated for the modification -- SLS and Nationstar.  Nor for that matter did plaintiff choose U.S. Bank; he refinanced, choosing to obtain a loan from BANA.  U.S. Bank, acting as trustee, came into the picture much later when the loan was securitized.  This is not a situation where a borrower went to a mortgage lending entity which, after evaluating the borrower and the borrower's security, issued a loan and the same entity then serviced the loan and negotiated any changes in the loan terms.  As the court in *Alvarez* noted, in modern loan servicing, "borrowers are captive, with no choice of servicer, little information, and virtually no bargaining power.  Servicing rights are bought and sold without input or approval by the borrower.  Borrowers cannot pick their servicers or fire them for poor performance.  The power to hire and fire is an important constraint on opportunism and shoddy work in most business relationships.  But in the absence of this constraint, servicers may actually have positive incentives to misinform and under-inform borrowers.  Providing limited and low-quality information not only allows servicers to save money on customer service, but increases the chances they will be able to collect late fees and other penalties from confused borrowers." (*Alvarez*, *supra*, 228 Cal.App.4th at p. 949.)  These considerations, which the *Alvarez* court noted in discussing the *Biakanja* factor of moral blameworthiness, are additional justification for finding that borrowers seeking to modify their residential loans like plaintiff are in a special relationship with the lenders and/or loan servicers.  The no-

tort-duty-for-economic-damages rule discussed in *Gas Leaks* and relied upon in *Sheen* simply does not apply here.[24]

### 4. Breach, Proximate Cause, and Damages

Plaintiff alleged that Nationstar and SLS breached their duty to him by "failing to accurately and reasonably evaluate Plaintiff for a loan modification. SLS mishandled and lost Plaintiff's financial documents, misdirected Plaintiff, failed to inform Plaintiff of documents that were needed for the loan modification review." Liberally construing the pleading (*Longshore, supra*, 25 Cal.3d at p. 22; *Daniels, supra*, 246 Cal.App.4th at p. 1162), we assume that by "misdirected," plaintiff meant to allege that SLS represented he would be granted the modification, an allegation made more than once elsewhere in the complaint. Similarly, as alleged in the complaint, Nationstar misrepresented that Plaintiff was eligible for a HAMP loan modification that he could have never qualified for instead of other loan workout options or modification that Plaintiff could have qualified for. Plaintiff further alleged that, as a proximate cause of SLS and Nationstar's

---

[24] We also note the absence of important factors that compelled our high court's conclusion that there should be no tort duty for economic damages in *Gas Leak* and cases like it. The court in *Gas Leak* sought to avoid limitless liability to an indeterminate number of plaintiffs. (*Gas Leak, supra*, 7 Cal.5th at pp. 403-408.) The court also noted that defendants in industrial accident cases will have more difficulty obtaining third-party insurance coverage against purely economic losses than will individual plaintiffs seeking comparable first-party insurance. (*Id.* at p. 405.) Also, line-drawing problems relating to both "space and time" result from imposing such a duty. (*Id.* at pp. 408-409.) For example, there would be "no workable way to limit geographically who may recover purely economic losses." (*Id.* at p. 410.) The court also observed that "the Restatement echoes widespread judicial concern that purely economic losses 'proliferate more easily than losses of other kinds' and are 'not self-limiting.' " (*Id.* at p. 407.) And our high court noted that, only when the foregoing considerations are "weak or absent," such as in *Biakanja*, does a duty to guard against purely economic losses exist under the Restatement approach to negligence claims. (*Ibid.*) In a negligent residential loan modification case, such as we have here, all of these considerations are absent.

breaches, he sustained damages as discussed *ante*. We conclude that, at this stage of the proceedings, plaintiff has adequately alleged breach, proximate cause, and damages.

### 5. Conclusion

We conclude that plaintiff pleaded duty, breach, proximate cause, and damages sufficiently to state a negligence cause of action. Therefore, we conclude the trial court erred in sustaining the demurrers to plaintiff's negligence cause of action.

## C. Trespass to Land – Nationstar

### 1. The Parties' Contentions

Plaintiff asserts that the trial court erred in sustaining defendants' demurrers as to his cause of action for trespass to land. According to plaintiff, the fact that he defaulted on his mortgage payments in 2009 and that a notice of trustee's sale was recorded on August 4, 2014, "have no effect on [plaintiff's] possession of the Subject Property in August 2014." According to plaintiff, until the property sold, it was his. Plaintiff asserts that he properly pleaded that he owned and possessed the land when Cyprexx entered.

Defendants respond that the trial court correctly concluded that plaintiff's allegations were insufficient because they did not show that defendants were not authorized to enter the premises in light of plaintiff's default. Defendants assert that section 9 of the deed of trust, which was the subject of their granted request for judicial notice, authorized entry when the borrower was in default. Defendants assert that consent is a complete defense to a trespass claim, and in section 9 of the deed of trust, plaintiff consented to an entry such as that performed by Cyprexx.

### 2. Elements of Trespass to Land

" 'Trespass is an unlawful interference with possession of property.' [Citation.] The elements of trespass are: (1) the plaintiff's ownership or control of the property; (2) the defendant's intentional, reckless, or negligent entry onto the property; (3) lack of permission for the entry or acts in excess of permission; (4) harm; and (5) the defendant's conduct was a substantial factor in causing the harm." (*Ralphs Grocery Co. v. Victory*

44

*Consultants, Inc.* (2017) 17 Cal.App.5th 245, 261-262.) " 'Where there is a consensual entry, there is no tort, because lack of consent is an element of the wrong.' " (*Spinks v. Equity Residential Briarwood Apartments* (2009) 171 Cal.App.4th 1004, 1043.)

### 3. Section 9 of the Deed of Trust

Section 9 provides, in pertinent part: "If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under the Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. . . . *Securing the Property includes*, but is not limited to, *entering the Property to* make repairs, *change locks*, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off." (Italics added.)

### 4. Analysis

Plaintiff has alleged in the second amended complaint that, on or about August 15, 2014, Nationstar hired Cyprexx to enter onto the property "and change the locks on his doors." Plaintiff only learned that this occurred because a notice was placed on the door. Plaintiff called Cyprexx, and a representative told him that Nationstar had hired Cyprexx "to secure the premises and to 'winterize' it." Plaintiff averred that he "was only recently able to gain access to the premises because of the locked doors." He further alleged that all of his personal effects and furniture were still in the property when Cyprexx entered the premises and changed the locks. Plaintiff asserted that Cyprexx entered onto the property "and changed the locks without [plaintiff's] knowledge or consent." With

45

regard to damages in connection with this cause of action, plaintiff asserted that he was unable to enter the premises, and he suffered emotional distress upon learning that strangers had entered his house "and changed the locks without his knowledge or consent. Further Plaintiff was forced to expend funds to hire a locksmith to enter the premises to change the locks again and now has a care taker maintaining the property to ensure no one else trespasses onto the property when Plaintiff is not there."

That plaintiff was in default is not disputed. Thus, plaintiff "fail[ed] to perform the covenants and agreements contained in" the deed of trust. A notice of trustee's sale was recorded on August 4, 2014. As a result of plaintiff's failure to perform, under section 9 of the deed of trust, Nationstar, as loan servicer, was authorized to, among other things, enter the property and "change locks." That is exactly what plaintiff alleges Cyprexx, as Nationstar's agent, did, and no more. The action taken by Cyprexx, on behalf of Nationstar, was expressly authorized under section 9 of the deed of trust.

Thus, plaintiff failed to allege a legally sufficient cause of action sounding in trespass to land because there are no allegations that Nationstar, or Cyprexx on its behalf, exceeded the scope of the action authorized under the deed of trust. As the trial court correctly concluded, the second amended complaint is silent as to how Nationstar lacked authority to enter onto the property and change the locks, particularly in light of the express provisions of the deed of trust authorizing such action.

Plaintiff asserts that no amendment to the trespass to land cause of action is necessary. However, he further represents that he can amend the second amended complaint to address arguments concerning the deed of trust. In this regard, he asserts only: "[I]f this Court agrees with the trial court that [plaintiff] should have addressed Respondents['] rights under the Deed of Trust and Notice of Default, [Plaintiff] can allege that unless and until the Subject Property was sold at a trustee's sale, it constituted his property."

46

We conclude that it is not reasonably possible that the defect in the second amended complaint could be cured by amendment. The only amendment proposed by plaintiff—that at the relevant time the property remained his property—could not change the result. (See generally *Zipperer, supra*, 133 Cal.App.4th at p. 1020 [where the nature of the claim is clear and under substantive law no liability exists, court should deny leave to amend because no amendment could change the result]; see also *Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081 [plaintiff bears burden of proving amendment would cure defect]; *Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [same]; *Mendoza v. JPMorgan Chase Bank, N.A.* (2016) 6 Cal.App.5th 802, 809 [same].)

Accordingly, the trial court properly sustained Nationstar's demurrer to the fourth cause of action without leave to amend.

### D. Unfair Competition Law – SLS, Nationstar, and U.S. Bank

### 1. The Unfair Competition Law

The "unfair competition law's scope is broad." (*Cal-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180 (*Cal-Tech Communications*).) "[I]t defines 'unfair competition' to include 'any unlawful, unfair or fraudulent business act or practice.' " (*Ibid*., quoting Bus. & Prof. Code, § 17200, fn. omitted.) "By proscribing 'any unlawful' business practice, 'section 17200 "borrows" violations of other laws and treats them as unlawful practices' that the unfair competition law makes independently actionable." (*Cal-Tech Communications*, at p. 180.) "However, the law does more than just borrow. The statutory language referring to 'any unlawful, unfair *or* fraudulent' practice . . . makes clear that a practice may be deemed unfair even if not specifically proscribed by some other law." (*Ibid*.) " 'Because Business and Professions Code section 17200 is written in the disjunctive, it establishes three varieties of unfair competition-acts or practices which are unlawful, or unfair, or fraudulent. "In other words, a practice is prohibited as 'unfair' or 'deceptive' even if not 'unlawful' and vice versa." ' " (*Cal-Tech Communications*, at p. 180.)

"A business practice is 'fraudulent' within the meaning of [Business and Professions Code] section 17200 if it is 'likely to deceive the public. [Citations.] It may be based on representations to the public which are untrue, and " 'also those which may be accurate on some level, but will nonetheless tend to mislead or deceive. . . . A perfectly true statement couched in such a manner that is likely to mislead or deceive the consumer, such as by failure to disclose other relevant information, is actionable under' " the [unfair competition law]. [Citations.] The determination as to whether a business practice is deceptive is based on the likely effect such practice would have on a reasonable consumer.' " (*Klein v. Chevron U.S.A., Inc.* (2012) 202 Cal.App.4th 1342, 1380.) "A 'fraudulent' activity includes any act or practice likely to deceive the public, even if no one is actually deceived." (*Jolley, supra,* 213 Cal.App.4th at p. 907.) " 'Unlike common law fraud, a Business and Professions Code section 17200 violation can be shown even without allegations of actual deception, reasonable reliance and damage.' " (*Brakke v. Economic Concepts, Inc.* (2013) 213 Cal.App.4th 761, 772.)

"The standard for determining what business acts or practices are 'unfair' in consumer actions under the [unfair competition law] is currently unsettled." (*Zhang v. Superior Court* (2013) 57 Cal.4th 364, 380, fn. 9.) Prior to the Supreme Court's opinion in *Cal-Tech Communications,* courts applied a balancing test to determine whether a practice was "unfair" under the unfair competition law. (See, e.g., *Klein v. Earth Elements, Inc.* (1977) 59 Cal.App.4th 965, 969-970.) Specifically, courts would balance the impact of the practice on the alleged victim, against the reasons, justifications, and motives of the alleged wrongdoer. (*Ibid.*) The Supreme Court rejected this approach in *Cal-Tech Communications*, an anti-competitive practices case, holding that a cause of action for unfair business practices must "be tethered to some legislatively declared policy or proof of some actual or threatened impact on competition." (*Cal-Tech Communications, supra,* 20 Cal.4th at pp. 186-187.) Although *Cal-Tech Communications* disapproved of applying the balancing test in consumer cases, the

48

Supreme Court expressly limited that holding to anti-competitive practices cases, stating: "Nothing we say relates to actions by consumers." (*Id.* at p. 187, fn. 12.)

Following *Cal-Tech Communications*, a split in authority has developed concerning the standard for consumer claims under the "unfair" prong of the unfair competition law. (Compare *Smith v. State Farm Mutual Automobile Ins. Co.* (2001) 93 Cal.App.4th 700, 718-719 [adopting the pre-*Cal-Tech Communications* balancing test] with *Gregory v. Albertson's, Inc.* (2002) 104 Cal.App.4th 845, 854 [adopting the "tether[ing]" test]; see also *Camacho v. Automobile Club of Southern California* (2006) 142 Cal.App.4th 1394, 1403 [adopting the test for unfairness set forth in 15 U.S.C. § 45(n)].) This court long ago adopted the balancing test (*Progressive West Ins. Co. v. Superior Court* (1999) 135 Cal.App.4th 263, 285-286) and, in the absence of any discussion of the appropriate standard by the parties, we continue to apply that test.

### 2. Plaintiff's Contentions

Plaintiff asserts that the trial court erred in sustaining defendants' demurrers to the sixth cause of action alleging a violation of the unfair competition law. Plaintiff asserts that defendants' actions were unlawful in that they "improperly reviewed him for a loan modification and, in fact, reviewed him for a program in HAMP that he could have never qualified for." Asserting that promissory fraud is a form of deceit prohibited by subdivision (4) of Civil Code section 1710, plaintiff asserts that his allegations suffice to state a cause of action under the "unlawful" prong. Plaintiff further asserts that whether conduct qualifies as "unfair" within the meaning of the unfair competition law is an issue of fact not appropriate for demurrer. According to plaintiff, defendants' practices were likely to deceive consumers. Plaintiff further asserts that, for largely the same reasons, defendants' conduct is actionable under the "fraudulent" prong.

### 3. Analysis

The complaint alleges defendants subjected plaintiff to a fraudulent application process, stringing him along with false assurances that a loan modification would be

forthcoming or that he was eligible for a HAMP modification, and then claiming, falsely and repeatedly, that plaintiff failed to supply requested documents. The complaint further alleges that defendants intentionally delayed the loan modification process by demanding that plaintiff submit the same documents over and over again, all in an attempt to increase arrears, penalties, and fees. These allegations adequately support a cause of action under the "fraudulent" and "unfair" prongs of the unfair competition law. (See *Rufini v. CitiMortgage, Inc.* (2014) 227 Cal.App.4th 299, 310 [allegation that lender "pretended to engage in loan modification efforts while actually intending to foreclose" stated unfair competition law cause of action under "fraudulent" and "unfair" prongs]; *Majd, supra*, 243 Cal.App.4th at p. 1304 [borrower sufficiently alleged violation of the unfair competition law based, in part, on lender's false assertion that he failed to provide required documentation].)

Defendants in their respondents' brief and plaintiff in reply discuss the remedies available to plaintiff in connection with this cause of action and whether he is entitled to them. "While the scope of conduct covered by the [unfair competition law] is broad, its remedies are limited. [Citation.] A[n] [unfair competition law] action is equitable in nature; damages cannot be recovered. [Citation.] Civil penalties may be assessed in public unfair competition actions. . . . [Citation.] We have stated that under the [unfair competition law], '[p]revailing plaintiffs are generally limited to injunctive relief and restitution.' " (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1144.) Plaintiff seeks both injunctive relief, enjoining the sale of the property, and disgorgement and restitution of late fees, penalties, and charges. Thus, plaintiff sought the appropriate remedies. (See *ibid*.) At this stage, reviewing the sustaining of defendants' demurrers, we do not consider whether plaintiff will be able to prove his entitlement to these remedies or the scope of the appropriate remedies.

We conclude the trial court erred in sustaining the demurrers to the unfair competition law cause of action.

50

## DISPOSITION

The order on the demurrer to the first amended complaint that we deem to incorporate a judgment of dismissal as to BANA is affirmed. The judgments of dismissal in favor of U.S. Bank, SLS, and Nationstar are reversed. The orders sustaining the demurrers to the second amended complaint are affirmed in part and reversed in part. The orders are reversed as to the causes of action for intentional misrepresentation (first cause of action) and negligent misrepresentation (second cause of action) insofar as asserted against Nationstar and U.S. Bank, and as to the causes of action for negligence (third cause of action) and violations of the unfair competition law (sixth cause of action) insofar as asserted against Nationstar, U.S. Bank, and SLS. In all other respects, the judgments are affirmed. The parties shall bear their own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(3),(5).)


                                                 _____/s/_____
                                                 MURRAY, J.


We concur:


_____/s/_____
BUTZ, Acting P. J.


_____/s/_____
DUARTE, J.